HELMAC PRODUCTS CORPORATION, a Michigan corporation, Plaintiff,

v.

ROTH (PLASTICS) CORPORATION, a Canadian corporation, Defendant.

Civ. A. No. 84–8225.

United States District Court, E.D. Michigan, S.D. at Flint.

July 14, 1992.

---

David A. Ettinger, James K. Robinson, Honigman, Miller, Schwartz & Cohn, Detroit, MI, Thomas J. Kenny, Raymond & Dillon, Southfield, MI, for plaintiff.

Lori Silsbury, Roger K. Timm, Dykema Gossett, Detroit, MI, for defendant.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Several motions are pending before the Court. The main focus of this Opinion will be upon the Motion for Default Judgment, brought by plaintiff Helmac, which alleges that the defendant willfully withheld, and possibly destroyed, documents that were responsive to document production requests. The defendant, Roth (plastics), denies the allegations. An evidentiary hearing was held, beginning on August 13, 1991 and continuing intermittently until August 30, 1991. Substantial amounts of testimony and exhibits were presented to the Court, and the parties offered opening and closing argument to the Court. After a review of the evidence, and the legal arguments made by the parties, the Court is inclined to grant Helmac's motion.

Other motions have a bearing on Helmac's Motion for Default, however. The Court will consider first Eric Roth's Motion for Summary Judgment to determine which defendants will be subject to any default judgment which might be entered. In its own Motion for Default Judgment, Roth (plastics) alleges

that Helmac engaged in its own discovery abuses. Since Roth (plastics)' conduct should not be viewed in a vacuum, it is also necessary to consider the implication of the allegations contained in Roth (plastics)' Motion for Default Judgment before entering a default judgment against the defendant. Finally, disposition of several of Roth (plastics)' Motions in Limine may shape the extent of damages which Helmac would be able to recover following entry of the judgment.

For these reasons, disposition of Helmac's Motion for Default Judgment is withheld pending disposition of Roth (plastics)' Motion for Default Judgement and Motions in Limine affecting damages arising from the sale of products allegedly produced in the United States.

## I.

### ERIC ROTH'S MOTION FOR SUMMARY JUDGMENT

Before the evidentiary hearing was held on Helmac's Motion for Default, the Court permitted Helmac to file an amended complaint which differed from the original complaint only in the addition of Eric Roth as an additional party defendant. Also before the evidentiary hearing, Eric Roth filed a motion for summary judgment arguing that Helmac's claim against Eric Roth was barred by the applicable statute of limitations.

### A. Relation back

■ Helmac's first argument in response is that the amendment and addition of Eric Roth relates back to the filing of the original complaint, pursuant to Fed.R.Civ.P. 15(c). The Court rejects this argument. Rule 15(c) permits the naming of new parties only in cases of misnomer. It permits the inclusion of a new defendant when that defendant had notice of the claim before the limitations period expired, and when the new defendant would know that, "but for the mistake concerning the identity of the proper party, the action would have been brought against that party." Fed.R.Civ.P. 15(c).

There is no question that this claim was properly filed against Roth (plastics), and that no mistake was made in this regard.

Eric Roth would not have read the complaint against Roth (plastics) in 1984 and concluded that Helmac intended to sue him as well. Indeed, there is no reason why Helmac could not have added Mr. Roth earlier in the proceedings of this case. He could reasonably conclude that Helmac did not intend to sue him for violations of the Antidumping Act.

Because there was no reason for Eric Roth to believe that Helmac intended to name him as the defendant in the antidumping claim, but named his corporation, Roth (plastics) by mistake, Rule 15(c) does not apply to relate the addition of Eric Roth as a party defendant to the time of the filing of the original complaint.

### B. Limitations period

■ What must be determined next, then, is the appropriate limitations period to be applied to a claim arising under the Antidumping Act of 1916. Both parties acknowledge that the statute contains no limitations period within its terms, and that the Court must apply a period from the most analogous statute. Eric Roth argues for application of the four year period used in the Clayton Act, which would have expired in the end of 1990. Helmac urges use of the five year period provided in the Tariff Act of 1930, 19 U.S.C. § 1621, which would have expired at the end of 1991. The addition in March of 1991 of Eric Roth as a party defendant would be untimely under the former, and timely under the latter.

#### 1. *Zenith Radio* and the Antidumping Act as an antitrust statute

There is no question that the Antidumping Act of 1916 is not subject to easy characterization. The statute resulted from the clash of two ideologies, one which sought to serve industry and labor by protecting American industries and jobs from foreign competition, and the other which sought to serve the American consumer by fostering competition from any source, domestic or foreign. In support of his position, Eric Roth cites *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1190 (E.D.Pa.1980). "We conclude then, on the basis of the statutory

564

text, that the 1916 Act is an antitrust, not a protectionist statute. That °conclusion is strongly corroborated by the political and legal history of the relevant era, and the legislative history of the 1916 Act...." *Id.* at 1215.

The *Zenith Radio* court carefully analyzed the legislative history, giving careful consideration to the positions of the political parties competing at the time the statute was passed. To summarize the *Zenith Radio* court's discussion, *see Zenith Radio* 494 F.Supp. at 1215–20, the Democratic Party advocated free-trade and strongly disapproved of the protectionist policies advanced by the Republican Party. All were aware of the competitive gains enjoyed by domestic industries as a result of the havoc wreaked on the European competitors by the First World War. All were equally aware that the end of the war would permit the European industries to attempt to recapture market share lost to American industries which, in 1916, still were unscathed by the Great War. There was consensus that the American industries' gains needed to be protected, but the parties evidently differed over methodology.

The anti-protectionist, free-trade Democrats opposed the imposition of tariffs to protect the American market from the European goods. According to the *Zenith Radio* court, the Democrats did not want to protect domestic producers from all competition, but only from unfair competition. They turned to antitrust law and applied its doctrines and theories to international trade. To support this conclusion, the court quotes a more contemporaneous analysis of the circumstances surrounding adoption of the Antidumping Act of 1916.

The Wilson administration, while showing itself wholly sympathetic with the desire for adequate protection from unfair foreign competition, was determined that it should not be employed to build up sentiment for an upward revision of the existing tariff act. It therefore recommended that any measure adopted to meet the problem should be divorced from customs legislation and should take the form of a further extension to those engaged in the import

trade of the restraints against unfair competition which had been imposed on domestic commerce.

*Zenith Radio,* 494 F.Supp. at 1220 (quoting J. Viner, *Dumping: A Problem in International Trade,* 242–43 (1923, reprinted 1966)).

2. Helmac's View—The Antidumping Act's protectionist purposes

Helmac has a different view of Congress' intent in passing the Antidumping Act of 1916 and of the implications this intent has on the selection of an appropriate limitations period. Helmac concludes that Congress intended the Antidumping Act of 1916 to be a protectionist statute. Because the intent of the Congress in enacting the Antidumping Act of 1916, the protection of domestic industry, is antithetical to the intent of antitrust doctrine, the preservation of competition, Helmac argues that it would be inappropriate to use antitrust periods of limitations, and more appropriate to turn to the protectionist and tariff statutes.

Whether the Antidumping Act of 1916 is protectionist in nature, and therefore antithetical to the goal of antitrust statutes which were designed to preserve competition, depends on a divination of Congress' intent. Helmac can cite no similar case law to support its position that the Antidumping Act of 1916 was intended to be a protectionist statute analogous to the Tariff Act of 1930 and subject to a five year limitations period, instead of an antitrust statute similar to the Clayton Act and subject to a four year limitations period.

a. *Helmac's cases are distinguishable*

Its citation to *Isra Fruit Ltd. v. Agrexco Agric. Export Co. Ltd.,* 631 F.Supp. 984, 989 (S.D.N.Y.1986) is misplaced. Although the court refers to the statute's protectionist purpose, it also refers to the statute's use of " 'the same price discrimination law applicable to domestic commerce.' " *Id.* (citing *Zenith Radio,* 494 F.Supp. at 1216)). The court's discussion has nothing to do with the proper characterization of the Antidumping Act of 1916 as a protectionist or antitrust statute, but rather considers the plaintiff's standing to sue given the absence of domes-

tic producers of the allegedly dumped product. *Isra Fruit,* 631 F.Supp. at 988-89.

*Western Concrete Structures v. Mitsui & Co. (U.S.A.), Inc.,* 760 F.2d 1013 (9th Cir.), *cert. denied* 474 U.S. 903, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985) similarly considers standing rather than the proper characterization of the Antidumping Act. *Id.* at 1019-1020 (standing under the Antidumping Act of 1916 is properly limited "to a domestic competitors of the alleged dumper" not "a domestic competitor of a domestic buyer of allegedly dumped goods."). *Schwimmer v. Sony Corp. of America,* 471 F.Supp. 793 (E.D.N.Y.1979), *aff'd,* 637 F.2d 41 (2nd Cir.1980) although it uses such words as "protect" and "shield," similarly focused, not on the proper characterization of the 1916 Act, but on the standing of the plaintiff to sue under the Act when one of its competitors bought products from the dumping foreign producer.

The cases cited by Helmac, then, cannot compete with the analysis contained in *Zenith Radio* of the legislative and political history of the characterization of the Antidumping Act of 1916 as an antitrust, as opposed to a protectionist, statute. They contain language that appears helpful to Helmac's position, but the context of the words vitiate the words' relevance to the characterization and analogy issues before the Court as it determines which limitations period to apply to Helmac's claim against Eric Roth.

### b. *legislative history*

Helmac performs its own analysis of the legislative history. "The legislative history indicates that the 1916 Anti-Dumping Act was included in the Revenue Act by the majority Democratic Party to garner the support and votes of the pro-protectionist Republican Party to a revenue bill which was fundamentally an anathema to the Republican platform." Helmac's Brief in Opposition to Eric Roth's Motion for Summary Judgment, at 14. An intent to endorse protectionist principles to garner additional votes for a broader legislative agenda, *see Zenith Radio,* 494 F.Supp. at 1221, is different from the intent argued in *Zenith Radio* to use antitrust doctrine in pursuit of a narrower legislative goal of protecting domestic indus-

try from unfair foreign competition and preserving competition in the American market. Because it has no case law to support its view of Congress' intent, Helmac is, in effect, pitting its view of legislative history against the view expressed by the Federal District Court in the Eastern District of Pennsylvania.

In support of its view of the legislative history, Helmac quotes several statements made by Members of Congress during debate of the Revenue Act of which the antidumping measure was but a small part. *See* Helmac's Brief in Opposition to Eric Roth's Motion for Summary Judgment, at 14-15, including n. 5.

> I consider as childish that provision of this bill prohibiting what is called "unfair competition;" it is commonly referred to as "antidumping," and pretends to protect the American industries.... The democratic leader ... in making his statement to the House said that the Republicans should support this bill because this provision against unfair competition is a protective measure and is a Republican policy.

57 CONG.REC. 10,475 (1916) (statement of Rep. Denison) (as quoted in Helmac's Brief in Opposition to Eric Roth's Motion for Summary Judgment, at 15, n. 5). Several other quotations from the debate of the Revenue Act give similar indications that the antidumping provision was perceived by some Members of Congress as a protectionist measure added to the Revenue Act to attract votes from Members of Congress from the Republican Party, and more importantly to protect domestic industry from unfair foreign competition.

In divining its view of Congress' intent, the court in *Zenith Radio* relies heavily upon the language contained in the Committee Report. "Statements made in a congressional committee report recommending adoption of legislation are highly authoritative in determining the purpose of that legislation. 'A committee report represents the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation.'" *Zenith Radio,* 494 F.Supp. at 1223 (quoting *Zuber v. Allen,* 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)). The only reference in the committee report indi-

cates that there is some reliance upon the antitrust statutes. "In order that persons, partnerships, corporations, and associations in foreign countries, whose goods are sold in this country, may be placed in the same position as our manufacturers with reference to unfair competition, your committee recommends" the adoption of the antidumping provisions. H.R.Rep. No. 922, 64th Cong., 1st Sess. 9–10 (1916) (as quoted in *Zenith Radio*, 494 F.Supp. at 1221).

Although Helmac offers arguments to rebut the *Zenith Radio* court's conclusion, it cannot counter the binding nature of committee reports in evaluating congressional intent. The best it can do to avoid the import of the committee report is characterize it as a "conclusory sentence fragment." Helmac's Brief in Opposition to Eric Roth's Motion for Summary Judgment, at 16, n. 6. There is no principled basis for placing more reliance on those portions of the debate cited by Helmac than on those relied upon by the *Zenith Radio* court. As with any analysis of legislative intent, it is hard to ascribe one intent that can be said to be held by all of the representatives and senators in Congress. The courts have placed more reliance on committee reports, and the *Zenith Radio* court has this factor weighing in favor of its view of the legislative history.

I am also persuaded by the *Zenith Radio* court's historical interpretation. Although Congress may have been trying to provide some measure of protection to American industry, it did so in a peculiarly Democratic, with a capital "D," fashion. The party was opposed to protective tariffs, and avoided using the old protective tariff formulas. It found a method by which it could prevent the European industries, which would eventually be free from the destruction of war, from ravaging newly created or expanded American industries, and still maintain its princi-

pled opposition to protective tariffs. By prohibiting only unfair foreign competition, the Democrats could protect both the domestic industries and the competitive marketplace.[1]

### 3. Helmac's "plain language" approach

Helmac correctly identifies critical language differences between the Antidumping Act of 1916 and the antitrust statutes. The "plain language" refers to four prohibited intents, and only the fourth intent, an intent to restrain or monopolize trade or commerce in the United States, bears any similarity to the antitrust laws. The other three intents refer to destroying or injuring a domestic industry or preventing the establishment of a domestic industry, all of which find no parallel in the antitrust statutes.

In addition, the Antidumping Act of 1916 prohibits certain pricing activities "done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States." 15 U.S.C. § 72. The Clayton Act prohibits certain different pricing activities "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition...." 15 U.S.C. § 13(a). The Antidumping Act focuses upon intent, whereas the Clayton Act focuses upon effect.

■ Helmac characterizes these arguments as "plain language" arguments. In construing a statute, courts certainly are bound to follow the plain meaning of the statute, if such a meaning can be established, before attempting to discover and follow Congressional intent. If the Antidumping Act of 1916 expressly provided its own limita-

---

1. On appeal, the Third Circuit Court of Appeals concluded that "The primary aim of the 1916 Act is to prohibit anticompetitive pricing." It provides support for this conclusion in a footnote, citing Commerce Secretary William Redfield's report on the bill.

The legislative history suggests that the majority party in the Congress at the time passed the Act to deal with unfair competition, and we will interpret the Act in light of its motivating

purpose. We are not unaware, however, that protectionist sentiment ran high in Congress and the country at the time.

*In re Japanese Electronic Products Antitrust Litig.*, 723 F.2d 319, 325, n. 4 (3rd Cir.1983). Although the Third Circuit's decision reversed in part the district court's decision, this analysis of the legislative history, although cursory, is consistent with the district judge's conclusions, as well as my own.

tions period, the Court would be bound to apply it. The plain language to which Helmac refers, however, is not the type of plain language which precludes consideration of legislative history and binds this Court to apply a five year limitations period as urged by Helmac. The statute contains no express limitations period. Although the language used by Congress distinguishes the Antidumping Act of 1916 from other antitrust statutes, it does not provide in plain language an applicable limitations period.

Rather than a plain language argument, Helmac actually is urging the Court to infer from Congress' choice of language an intent to borrow a limitations period from the tariff statutes. But Congress' language choice provides no better an indication of Congress' intent than the other legislative history discussed above. These differences do not alter the Court's conclusion that, for purposes of selecting a limitations period, the Antidumping Act of 1916 is analogous to the antitrust statutes. Helmac's language-based argument therefore is rejected as it applies to identification of an applicable limitations period.

This does not mean that the Antidumping Act of 1916 must be interpreted consistently with the antitrust statutes in all situations. The language differences may have serious implications in other contexts. Such a possibility is recognized in *Zenith Radio*. "The principal lesson which we draw from the legislative history of the 1916 Act, viewed against the historical background of the first Wilson administration, is that the statute should be interpreted *whenever possible* to parallel the 'unfair competition' law applicable to domestic commerce." *Zenith Radio*, 494 F.Supp. at 1223 (emphasis added). Despite its characterization of the Antidumping Act of 1916 as an antitrust statute, the *Zenith Radio* concluded that Congress intended to incorporate certain principles provided in the Tariff Act of 1913. "For, by incorporating in the 1916 Act a phrase from contemporary customs law, Congress must have in-

tended to direct that the appraisement of imported merchandise under the 1916 Act follow the principles set forth in the Tariff Act of 1913." *Zenith Radio*, 494 F.Supp. at 1216. These language distinctions can be critical, therefore, depending upon the issue under consideration. Although the language does not help Helmac's position in selecting an applicable statute of limitations, subsequent discussion in this Opinion will find Congress' language choices determinative.[2]

However, the task at hand is identification of the appropriate limitations period to be applied to claims arising under the Antidumping Act of 1916. Since the language of the Antidumping Act of 1916 parallels the domestic price discrimination language contained in section 2 of the Clayton Act, as amended by the Robinson–Patman Act, the *Zenith Radio* court concluded, and this Court agrees, that the antidumping statute should be read "in tandem with" the Clayton Act. I conclude that this parallelism includes any limitations period.

The Clayton Act carries a limitation period of four years. As discussed above, that period expired before Eric Roth was added as a party defendant. The addition of Eric Roth as a party defendant does not relate back to the filing of the original complaint against Roth (plastics). The statute of limitations has expired on any claim that Helmac may have against Eric Roth arising under the Antidumping Act of 1916 prior to April 2, 1987. Eric Roth is entitled to summary judgment, and his motion is GRANTED.

## II.

## HELMAC'S MOTION FOR DEFAULT JUDGMENT

### A. Factual Background

The Court will note that the relationship between the parties is a poisoned one. Eric Roth and Nicholas McKay formed a partnership, under the name Helmac, to develop a

---

2. As discussed in the previous footnote, the Third Circuit Court of Appeals cursorily adopted the *Zenith Radio* court's analysis of the legislative history. In the footnote, the appeals court recognized the existence of protectionist sentiment in Congress. *See In re Japanese Electronic Products Antitrust Litig.*, 723 F.2d at 325, n. 4. I believe this protectionist sentiment was reflected in congress' language choices.

plastic lint brush business. The two men split with some acrimony when Roth left Helmac to start his own business, Roth (plastics). Eventually, Roth (plastics) inherited a lion's share of the market in Canada, and Helmac remained principally in the United States. Since that time, however, the two companies appear to have engaged in questionable practices to wrest market share away from the other.

This litigation started in 1984 when Helmac brought this action under the Anti-Dumping Act of 1916, 15 U.S.C. § 72. Helmac alleges that Roth (plastics) set artificially low prices on its lint brush products to increase its market share at the expense of Helmac. Roth (plastics) had previously sued Helmac in Canada for dumping Helmac products north of the border, so the hyper-competitive nature of the parties' relationship is well established.

### B. Factual Issue—Were documents withheld and destroyed?

■ The root cause of the current motions is a request for production of documents made in 1984. The request asked for documents that would be used to establish costs of production and pricing for products, i.e. cost analyses or studies, labor costs, and pricing and sales reports. Roth (plastics) represented to Helmac that the request had been filled, and for five years, Helmac believed it.

In March of 1989, however, Roth Plastic's general manager, Frank DeGoey, left his employment with the company, and in April of 1990, started working for Helmac. At some subsequent time, DeGoey made the suggestion to his new compatriots that Roth (plastics) had not produced all of the documents requested. In DeGoey's declaration accompanying Helmac's default motion, he states "Roth Plastic Corporation intentionally did not produce all the documents which were responsive to Helmac's requests, and held back those documents which were believed to be harmful to Roth (plastics)." DeGoey Declaration, para. 2. Indeed, it is alleged that Eric Roth specifically instructed his employees to determine which documents would be harmful to Roth Plastic's case, and

withhold them from the document production.

Armed with this information, Helmac came to Court to complain. According to Helmac, these documents are crucial to establishing Roth Plastic's anti-competitive pricing practices, and therefore critical to Helmac's anti-dumping case. It seeks, therefore, a judgment of default against Roth (plastics), or relief from the burden of establishing those parts of its anti-dumping case which would rely upon the documents wrongfully withheld.

Having reviewed the testimony, I believe the record clearly establishes that documents were withheld. I think the testimony of the Roths and David Brown must be disregarded. David Ettinger's characterization of this testimony as an ever evolving fiction is consistent with my view of Roth (plastics)' version of the facts. All through Roth (plastics)' case in chief, I felt as though the Roths' positions were changing in reaction to the increasingly troublesome disclosure of additional facts.

Their first reaction was that Peter Roth did everything, and that David Roth and Frank DeGoey were not to be bothered. Since Peter performed 90% of the document production, DeGoey and David Roth could not have been involved, and DeGoey would know nothing of any intention to withhold damaging documents. This story was sustained during Peter Roth's deposition. It had to change when the Roths were confronted with Linda Davies' deposition and its description of the Saturday session. The first story also denied that any boxes were kept at Eric Roth's apartment at The Gates of Belle View. But DeGoey saw the boxes. Suddenly the Roth witnesses figured out that these other people had to have been involved.

So, in Roth Plastic's Opening Statement, Davies' testimony was incorporated into the story. The other Roth Plastic employees were involved, then. And there *were* boxes at "The Gates," but they came from Eric Roth's country estate.

The involvement of all these employees was inconsistent with the deposition testimony of Robert Gorlund, Roth Plastic's first

attorney. Gorlund's list of documents to be removed from the document production was a short one. What kept all these employees, who in the original story were not involved at all, so busy at this "Saturday session"? Boxes needed numbering, and moving, according to the apparently extemporaneous story-telling of Eric and David Roth. The boxes were numbered by attorney Gorlund, however.

Ettinger's characterization rang true to me because, during the testimony of Eric and David Roth, I was physically uncomfortable with the apparent efforts these two gentlemen were making to make all of their stories work-out, and to make Mr. Ettinger's challenges to them appear inconsequential. For instance, at the beginning of the hearing, the boxes in the courtroom all came from Eric Roth's country estate. When Roth's attorneys were confronted with evidence that Linda Davies was responsible for shipping some boxes to Eric Roth's apartment, suddenly Eric Roth decided that some of the boxes *also* came from the plant, although they too were filled with personal items, such as his boy scout belt. Even David Brown's testimony changed when sufficiently challenged by skillful cross-examination.

On the other hand, I think the Court cannot rely upon DeGoey's testimony, although I find it more reliable than the Roths' testimony. To Mr. DeGoey's credit, he admits that he lied under oath during the depositions he gave while still employed by Roth (plastics). In any case, the Court cannot believe the Roths' testimony, and cannot put great faith in Mr. DeGoey's.

I think the only credible witnesses are John Marsala, John Wismayer and Linda Davies. Together you get the picture that production analyses, costing sheets, minutes of meetings and the like were created in the usual course of Roth (plastics)' business, and all were kept, at least until 1984. I think Linda Davies' deposition testimony contains enough recollection of detail to be reliable. From that testimony, it is unmistakable that prior to the visit of Mr. Gorlund, Eric Roth ordered his staff to remove those documents that could be damaging to Roth's case.

Roger Timm, on behalf of Roth (plastics), argues that Helmac bought a witness when they hired Mr. DeGoey, and brought a default motion "to try to win on procedural grounds that which they cannot win on the merits." Transcript of Closing Arguments, at 47. Although I am sympathetic with Mr. Timm's plight of keeping on top of his client's penchant for changing stories, the various stories, as well as Mr. Timm's attempts to minimize the inconsistencies and implications, do not wash.

Timm argued that it is obvious that this entire claim of withholding documents "is inherently stupid and unbelievable." Transcript of Closing Arguments, at 58. Timm's argument relies upon *his* legal perspective, however, that Roth (plastics) is liable, not for price suppression, but only for the sales Helmac actually lost. The documents that were allegedly withheld because they would demonstrate how Helmac had to reduce its prices to compete with Roth Plastic's dumping prices, then, would be irrelevant. Roth (plastics) produced the invoices which show the prices charged. Therefore, there would be no reason for Roth (plastics) to withhold the cost analyses, price quotations, sales reports and production statements because Roth's defense would not be helped. Eric Roth must have known, according to Timm, that it would be silly to withhold documents because the invoices that were produced contain all the pricing information that would be contained in the documents that were allegedly withheld. "If you've produced the sales invoices, you've produced all of the, quote, incriminating evidence, end quote, that exists." Transcript of Closing Arguments, at 58.

This argument is specious. I don't think Eric Roth could be sure, when he was asked to produce documents in 1984 to be used in the anti-dumping case pled by Helmac, that the costing and production sheets at issue here would be irrelevant to one of Helmac's claims. Indeed, until today, the Court has yet to determine whether price suppression is irrelevant in determining the merits of this case. I find it entirely incredible that Eric Roth would feel so secure about his attorneys' legal opinion that he confidently would produce the invoices simply because his at-

torneys said price suppression was not an issue.

Rather, I am convinced that Eric Roth felt threatened by the documents that existed, and with a dim view towards the American litigation process, felt emboldened to withhold those documents which threatened him. As Timm pressed the "inherently stupid and unbelievable" argument, I felt more and more certain that he was getting a bit desperate, and I began to wonder if Eric Roth would be angry at his attorney for characterizing as stupid those actions which I believe Mr. Roth took in 1984. As Mr. Ettinger stated, the fact that Eric Roth's plan was ill-conceived does not mean that it was not conceived at all. "I would suggest that if a conspiracy looks unintelligent, if that means there was no conspiracy, then there are a lot of people in the Soviet three-day junta who ought to get out of jail immediately." Indeed, Ettinger points out that the Roths' conspiracy almost worked, and it certainly held up longer than the Soviet coup attempt.

The Roths testified that the use of cost analyses and production reports and the like was not necessary because Roth (plastics) is a small, family operation. They point to the fact that none of the subsequent document productions contained these kinds of reports, and yet there are no allegations that documents were withheld during these subsequent document productions. I am not persuaded by this argument. Rather, I am persuaded by Ettinger's suggestion that Roth is being more careful about such things since the 1984 document production. Despite Roth's claims that it is not a "General Motors," there is some evidence that Roth used to retain everything. I can't understand how Roth could price its products without making any findings as to its labor costs. Eric Roth could keep tabs on material costs, but production analyses had to have been performed to ascertain labor, and therefore final, costs. These documents had to exist, and their existence is confirmed by Wismayer and Marsala. Only the Roths and David

Brown argue that the documents don't exist, and I think they all have impeaching biases.

Basically, relying mainly upon the testimony of Wismayer and Marsala, and to some degree upon DeGoey, and discounting the biased testimony of Roth and David Brown,[3] I think it is clear that the documents which are the subject of the present motion existed at some time. Linda Davies confirms DeGoey's claims that Eric Roth ordered his employees to withhold from the attorneys and from production, those documents that might help Helmac prove its anti-dumping case against Roth, and that might be damaging to Roth's defenses. She confirms the evidence that the documents were to be sent to the Gates of Belle View, and later reincorporated into the file. Roth Plastic's attempts to characterize her testimony as honest but mistaken is not persuasive. Her recollection of the purpose for the Saturday session is clear, and confirmed by the rest of the evidence. I conclude that Helmac has met is burden of showing that documents responsive to its discovery requests were deliberately withheld by Roth personnel.

It is hereby the finding of this Court that:

1. in 1984, Helmac requested from Roth (plastics) production of documents which reflected the costs of producing, transporting, selling or exporting lint brushes for the United States' market, the methods used to set prices, and the quotations of prices made to customers in the United States;

2. documents responsive to these requests existed at the time of the request;

3. these documents, including cost estimates, production and labor analyses and reports, inventory reports, and price quotations were withheld willfully from Helmac in violation of the Federal Rules of Civil Procedure governing discovery;

4. the documents were withheld intentionally to prevent discovery by Helmac of documents that would be damaging to Roth (plastics)' defense against Helmac's anti-dumping case;

---

**3.** I was left with the impression that in his testimony David Brown sought to please and protect

Mr. Roth.

5. these documents were ultimately destroyed and are unavailable to assist Helmac in its preparation of its case against Roth (plastics).

## C. Legal Issues—Standard for imposing default

Having made the factual determination, the Court must now turn to consideration of the applicable law to determine the appropriate response to Roth Plastic's willful violation of discovery rules and the damage that violation has done to Helmac's case against Roth (plastics).

*Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107 (S.D.Fla.1987) involved a similar willful destruction of documents that were subject to discovery requests in a complex anti-trust case. Corporate counsel for the defendant ordered the destruction of all the pricing documents he believed would be damaging to the corporate defendant. In response, the district court defaulted the defendant. Helmac requests this Court to deal with Roth Plastic's willful misconduct in a similar manner.

■ The *Telectron* court found the power to default the party responsible for the willful destruction of documents responsive to discovery requests in a district court's "inherent power to regulate litigation and to sanction litigants for abusive practices." *Telectron,* 116 F.R.D. at 126, 128 (citing, *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980), *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 951 (9th Cir.1976), and *Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1455 (C.D.Cal.1984). The court also found the power to use the sanctions provided in Fed.R.Civ.P. 37(b)(2). Although Rule 37(b) applies when a party fails to comply with a court order, Rule 37(d)'s requirement that a party participate in discovery that is not regulated by the court expressly adopts most of the sanctions in Rule 37(b)(2), including the power to grant a default judgment. *See Telectron,* 116 F.R.D. at 128–29, n. 8.

■ Because of seventh amendment concerns, and the public policy that cases should be decided upon consideration of the merits of the case, default should be used only in " 'flagrant cases' in which it is demonstrated that the failure to produce 'materially affect[s] the substantial rights of the adverse party' and is 'prejudicial to the presentation of his case.' " *Telectron,* 116 F.R.D. at 129 (quoting *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 504 (4th Cir.1977) *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978)). Default, like dismissal, should be imposed only when less severe sanctions cannot redress adequately the wrongdoing. *Telectron,* 116 F.R.D. at 129 (citing *Hashemi v. Campaigner Publications, Inc.,* 737 F.2d 1538 (11th Cir.1984), *Aztec Steel Co. v. Florida Steel Corp.,* 691 F.2d 480, 481–82 (11th Cir.1982) *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983), and *Bryant v. City of Marianna,* 532 F.Supp. 133, 137 (N.D.Fla.1982). Still, severe sanctions should be used, not just to penalize, but to deter other potential abusers of the discovery process. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976).

*Telectron* distinguishes between cases in which a party fails to comply with court ordered discovery and fails to provide adequate responses to interrogatories, and cases in which a party willfully destroys documents. Dismissal or default has been upheld in the former cases, but the *Telectron* court found a greater justification for such a serious sanction in the latter case. *Id.* at 130. "The policy of resolving lawsuits on their merits must yield when a party has intentionally prevented the fair adjudication of the case" by destroying documents. *Carlucci v. Piper Aircraft,* 102 F.R.D. 472, 486 (S.D.Fla. 1984); *see also Fox v. Studebaker-Worthington, Inc.,* 516 F.2d 989 (8th Cir.1975), *Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1455 (C.D.Cal.1984).

The Court has concluded that Roth (plastics) has destroyed the documents at issue in this case. I believe the documents were destroyed intentionally to prevent fair adjudication of the dispute between Helmac and Roth (plastics). Roth (plastics), and not Helmac, should bear the costs of Roth (plastics)'

willful conduct. If fair adjudication has been prevented by this conduct, it is Roth (plastics) that should be prejudiced. As demonstrated by the legal analysis which follows, Roth (plastics)' conduct has succeeded in preventing fair adjudication. Because Helmac has been prejudiced in its ability to prove its case against Roth (plastics), Roth (plastics) should be defaulted.

The *Telectron* court applied the following standard before defaulting the defendant that willfully destroyed documents in an antitrust case: "[The court] must make the following findings: (1) that Defendant acted willfully or in bad faith; (2) that Plaintiff was prejudiced by Defendant's conduct; and (3) that lesser sanctions would not serve the punishment-and-deterrence goals set forth in *National Hockey League* and its progeny." *Telectron*, 116 F.R.D. at 131.

*Telectron* appears to be directly on point. It involves the willful destruction of documents in a complicated antitrust case. Roth (plastics) attempts to distinguish it because corporate counsel ordered the destruction, rather than the client. I think this attempted distinction is weak. Indeed, there may be greater reason to default a party when its principals directly participate in the destruction, as opposed to holding the client responsible for the actions of its employees or corporate counsel. An application of the standards identified and applied in *Telectron* will guide this Court to a proper response to Roth Plastic's willful behavior.

D. Legal Issues—Application of the *Telectron* standard

1. Willfulness

The Court has already made the finding that Roth (plastics)' decision to destroy the documents related to costs, production, pricing and quotes was willfully made to prevent Helmac's discovery of documents that would be damaging to Roth (plastics)' defense in the anti-dumping case brought by Helmac against Roth (plastics). For this reason it is unnecessary for the Court to engage in the analysis used in *Nation–Wide Check Corp. v. Forest Hills Distrib.*, 692 F.2d 214, 217 (1st Cir.1982) ("When the contents of a document are relevant to an issue in the case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him.") to presume that Roth (plastics) believed the documents to be damaging. The documents withheld were selected to be withheld on the basis of Eric Roth's perception that they would be damaging to Roth (plastics)' defense. No presumption need be employed to establish the willful withholding and destruction of the documents at issue in this case.

2. Prejudice

■ Roth (plastics) makes three arguments against a finding that Helmac was prejudiced by any destruction of documents which might have occurred. First, it argues that the Antidumping Act of 1916 can be violated only if actual sales have been made. Any evidence regarding Roth (plastics)' sales in the United States was produced in the form of invoices. Any evidence of Roth (plastics)' offers of sale which were never consummated are irrelevant, and Helmac could not be prejudiced by their destruction. Second, Roth (plastics) argues that Helmac cannot, with or without the documents at issue, prove that Roth (plastics) intended to engage in predatory pricing, and therefore cannot meet its burden of stating a violation of the Antidumping Act. Finally, in an argument similar to the first, Roth (plastics) argues that Helmac can recover damages for lost sales only, and cannot recover damages resulting from price suppression. The invoices provide ample evidence regarding any lost sales. Because the missing quotations only would demonstrate price suppression damages, they are irrelevant, and their destruction could not prejudice Helmac.

a. *Elements of a claim under the Antidumping Act of 1916.*

The Antidumping Act of 1916, 15 U.S.C. § 72, provides, in pertinent part, as follows:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported

or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: *Provided*, That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States.

Roth (plastics) argues that, to state a cause of action under this statute, Helmac must demonstrate that Roth (plastics) dumped its product on the United States' market with intent "to drive out competition, intending to recoup its lost profits over the long term." Roth (plastics)' Opening Statement, at 35. Roth (plastics) also argues that Helmac must also prove that it was injured by actual lost sales. "[Q]uotations which do not result in actual sales do not violate the Act." Roth (plastics)' Opening Statement, at 32.

*i. lost sales requirement in determining liability and damages*

 Roth (plastics)' focus on lost sales is derived principally from *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1190 (E.D.Pa.1980).

[T]he court held that:

Generally, dumping is the **sale of commodities in a foreign market** at a price which is lower than the price or value of comparable commodities in the country of their origin. *Id.* at 1194 (Emphasis added).

Roth (plastics)' Opening Statement, at 33. The issue in *Zenith Radio* was not whether the Antidumping Act can be violated in the absence of actual sales.

While *Zenith Radio* is helpful for analysis of the applicability of anti-trust law to an anti-dumping case under the Antidumping

Act of 1916, it is inapplicable to a determination of whether price suppression damages are recoverable or not. Any statements it made in this regard were gratuitous because the issue in that case was whether the prices of similar products in the country of origin could be used to establish a violation of the Act by showing that the price charged in the US was substantially less than the price charged in the country of origin. It has nothing to do with whether a plaintiff must show actual lost sales, and the passage quoted by Roth (plastics) as if it were a mantra is dicta in its purest form.

Helmac argues that the "Supreme Court held that damages can occur through lost profits or price suppression." Plaintiff's Reply Brief, at 4. It quotes from *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 564, n. 4, 101 S.Ct. 1923, 1928, n. 4, 68 L.Ed.2d 442, 449 (1981). "If the favored purchaser has lowered his retail price, for example, the disfavored purchaser will lose sales to the extent it does not match the lower price. Similarly, if the disfavored purchaser matches the lower price, it will lose profits." Damages resulting from lost sales and price suppression are offered gratuitously by the Supreme Court as examples of damages which result when the favored purchaser lowers his prices. The legal issue considered in the footnote, however, is the ability of the disfavored purchaser to establish antitrust injury, and thus state an antitrust cause of action, when the favored purchaser has not lowered his price. The statement is not necessary to the argument being made in the footnote. Indeed, the Supreme Court concludes at the end of the footnote that it need not decide the issue at all. Thus, while the opinion states the right words, from Helmac's perspective, it deals with the issue of the recoverability of price suppression damages very tangentially. That portion of the opinion relied upon by Helmac, then, certainly cannot be said to be a holding.

Other cases cited by Helmac hold more water. The court in *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 385 (8th Cir.1987) stated that one of the elements of a claim under the Robinson–Patman Act "is a reasonable possibility that the price

discrimination may substantially injure competition." One of the ways a plaintiff can demonstrate this possibility is the introduction of "direct evidence that disfavored competitors lost sales *or profits* as a result of the discrimination." *Id.* (citing *Falls City Ind. v. Vanco Beverage, Inc.*, 460 U.S. 428, 437–38, 103 S.Ct. 1282, 1290, 75 L.Ed.2d 174 (1983)) (emphasis added). The court rejected an argument that is identical to the one advanced by Roth (plastics). Even though the plaintiff admitted that it had lost no sales as a result of the price discrimination, "It was still sufficient proof of competitive injury for Rose Confections to show that it lowered prices to existing customers and lost *potential* customers as a result...." *Id.* at 386–87 (emphasis in original). This holding was echoed in *J.F. Feeser, Inc. v. Serv–A–Portion*, 909 F.2d 1524, 1537–40 (3rd Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (recognizing that deposition testimony of sales staff regarding the need to reduce prices in response to price discrimination, in combination with evidence of lost sales, sufficient evidence of competitive injury; also recognizing lost profits as recoverable damages).

Citations to several cases appear in Roth (plastics)' briefs and statements, including *Russ' Kwik Car Wash v. Marathon Petroleum Co.*, 772 F.2d 214 (6th Cir.1985), *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 755, 67 S.Ct. 1015, 1020, 91 L.Ed. 1219 (1947), and *Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962 (5th Cir.) *cert. denied* 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979). These cases consider price discrimination claims brought under the Robinson–Patman Act, and conclude that there must be an actual sale of the product in order to state a violation.

A price discrimination claim under Robinson–Patman is different from a claim brought under the Antidumping Act of 1916. In an antidumping claim, there are two competitors, one foreign and one domestic, operating on the same level of the marketing chain. When the foreign competitor lowers his

prices with the requisite intent under the Act, a violation occurs. Under Robinson–Patman, there are two levels of activity at issue. On one level are two purchasers buying the same or similar product from a single supplier who operates at a different level of the chain. For some reason, the supplier is charging a different price to the two competitors. Because its costs for obtaining the supplier's product are less, the favored purchaser can charge a lesser price to the individuals or entities which buy its product. The disfavored purchaser has higher costs, must charge higher prices, and suffers the competitive disadvantage as a result. This distinction between an antidumping claim and a price discrimination claim under Robinson–Patman destroys much of the applicability of Robinson–Patman jurisprudence to antidumping claims.

It is obvious that a sale must take place to state a Robinson–Patman claim. It is a requirement born from the type of conduct that is being prohibited by the statute, one supplier giving a competitive edge to one competitor by charging a lower price.[4] There is no way the favored purchaser could gain the competitive advantage until that sale from the supplier to the favored purchaser takes place. Without the sale, the favored purchaser has received no cost benefit, and no competitive advantage. This explains the sales requirement of a claim under Robinson–Patman claim.

There is no similar requirement in an antidumping claim. When one competitor unilaterally decides to lower his price with the requisite intent, that creates the violation. Thus I conclude that the actual sales requirement of a Robinson–Patman claim cannot be transferred to an antidumping claim.

This distinction does not totally defeat the applicability of this jurisprudence, however. I am convinced by the reasoning in *Rose Confections, supra* and *J.F. Feeser, supra* that a business is injured when it must lower its prices in response to its competitor's un-

---

4. Price discrimination can occur when the supplier withholds from one purchaser a benefit it gives to all other purchasers. *See J. Truett Payne, supra* (car manufacturer provided lower sales objectives to all other dealers, except the plaintiff, who, as a result, received fewer bonuses, and had to suffer the competitive disadvantage of charging higher prices).

fair practices, and that price suppression damages are recoverable in antitrust cases. Even though the important distinctions between antitrust statutes and the Antidumping Act of 1916 make some antitrust jurisprudence inapplicable to an antidumping claim, I believe that the rationales behind recognizing price suppressions damages in antitrust cases can be applied equally to claims arising under the Antidumping Act of 1916.

I do not believe that the actual sales requirement applies, however. As a result, the Court, in this antidumping claim, need not follow the Sixth Circuit precedent which limit damages in Robinson–Patman price discrimination claims to damages resulting from lost sales, and which include actual lost sales as an element to stating a cause of action.

### ii. requisite intent

██ Having established that it is not necessary for Helmac to show actual sales to establish a violation of the Antidumping Act of 1916, and that price suppression damages are recoverable, the only legal issue raised by the parties regarding the elements of an antidumping claim is the question of intent.

Roth (plastics) argues that a predatory pricing claim, like Helmac's claim, cannot be stated without " 'smoking gun' evidence of predation," or alternatively stated, an intent "to drive out competition, intending to recoup its lost profits over the long term." Roth Plastic's Opening Statement, at 35. It warns the Court against protecting a less efficient competitor from the rigors of the free enterprise market place.

> Pricing is predatory when a company foregoes short-term profits in order to develop a market position such that the company can later raise prices and recoup profits.... Predatory pricing differs from healthy competitive pricing in its motive: "a predator by his pricing practices seeks 'to impose losses on other firms, not garner gains for itself.' " ... Price reductions that constitute a legitimate, competitive response to market conditions are not predatory.

*Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 (6th Cir.1982) (cita-

tions omitted). Roth (plastics) argues that the market for lint removal devices presents few barriers to entry into the market. Roth (plastics) could never hope to recoup its losses by raising prices after elimination of Helmac as a competitor because another competitor could quickly move into the market to replace Helmac as a competitor. These market conditions, if they exist, would make it impossible for Helmać, with or without the destroyed documents, to meet the intent requirement advanced by Roth (plastics).

Helmac characterizes this argument as "the recoupment theory," a "novel Chicago school economic theory" that is applicable only to antitrust cases. Transcript of Helmac's Closing Statement, at 43. I am uncertain whether the Sixth Circuit has adopted or rejected application of the "recoupment theory." In *Richter Concrete*, the Sixth Circuit considered the applicability of this theory, and some of its variations, to a claim of predatory pricing. Because the plaintiff was unable to meet any of the standards, its claim was dismissed. In the end, the Sixth Circuit reaffirmed that the proper focus is upon the existence or nonexistence of an intent to injure competition.

> Economic tests, such as those suggested by Areeda–Turner and their critics, provide useful tools for analyzing predatory pricing cases. However, it is important for courts to keep in mind that the main purpose of the antitrust laws is to preserve and promote competition. Whether or not a particular practice violates the antitrust laws is determined by its effect on competition, not its effect on a competitor.

*Richter Concrete*, 691 F.2d at 825.

A stronger argument against adoption of the recoupment theory into the law of the Antidumping Act of 1916 is the critical language differences, identified above in the discussion of Eric Roth's Summary Judgment motion, between the Antidumping Act and the antitrust statutes. The Antidumping Act focuses upon intent while the antitrust statutes focus upon effect. Besides injury to competition, the Antidumping Act also provides a cause of action when the defendant

attempts to, among other things, injure an industry in the United States.

Other courts have recognized that other elements of an antitrust claim are not applicable to a claim brought under the Antidumping Act of 1916.

> The 1916 Antidumping Act, unlike *e.g.* section 2 of the Sherman Act, does not require plaintiffs to show that any defendant's predatory intent was accompanied by a dangerous probability of success. Thus the plaintiff is entitled to attempt to establish a defendant's predatory intent by inference, even if the defendant's small market share makes it unlikely that it will succeed in hurting American industry.

*Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 494 F.Supp. 1190, 1201 (E.D.Pa.1980).

If Helmac were claiming that Roth (plastics)' conduct injured competition, it is possible that adoption of the recoupment theory would be appropriate. The ability to recoup losses following the elimination of a competitor from the market is relevant only if an intent to injure competition is alleged. Helmac alleges that Roth (plastics) attempted to injure Helmac, an industry in the United States. Such an allegation, if proven, would establish a violation of the Antidumping Act of 1916. It is not necessary, however, for Helmac to prove that Roth (plastics) had the ability to recoup the losses incurred in eliminating Helmac from competition.

### iii. Conclusion on Roth (plastics)' arguments regarding the elements of an antidumping claim

Thus the Court has carefully considered and rejected Roth (plastics)' arguments that Helmac could not be prejudiced by the withholding and destruction of the documents. Helmac need not demonstrate actual lost sales, either to establish a violation of the Act or to collect damages. The production of invoices is not sufficient given the destruction of other pricing and quotation documentation. Additionally, the ease of entry into the lint brush market and Roth (plastics)' ability to recoup the losses sustained in eliminating Helmac from competition is not essential to Helmac's claim.

### b. Helmac's ability to establish prima facie case

Roth (plastics) argues that Helmac brought this motion for default judgment because it was clear that Helmac could not win the case on the merits. The principle arguments in this regard were the arguments considered and rejected above regarding the elements of an Antidumping claim. Assumedly, Roth (plastics) also referred to perceived evidentiary weaknesses in Helmac's case. Helmac responded by claiming that it could easily establish a *prima facie* case of violations of the Antidumping Act. This claim does not defeat Helmac's claim of prejudice, however.

Undoubtedly, Roth (plastics) will offer evidence to rebut Helmac's charges. Helmac is entitled to all the evidence it could have mustered, absent the destruction of the documents, to rebut Roth (plastics)' defense. The pricing sheets, quotation letters, and production and cost analyses all are crucial to Helmac's case, even if Helmac believes that it has a chance of winning without them.

The willful destruction of documents undertaken by Roth (plastics) has impeded Helmac's ability to prove that Roth (plastics) intended to injure Helmac. The destruction has similarly inhibited Helmac's ability to prove that Roth (plastics) violated the Antidumping Act by pricing its products at a level that was "substantially less than the actual market value or wholesale price of such articles ... in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported." Antidumping Act of 1916, 15 U.S.C. § 72. I conclude that it is clear that Helmac has been severely prejudiced by the willful withholding and destruction of these documents.

### 3. Availability of Lesser Sanctions

The *Telectron* court identified three goals to be served by sanctions in cases involving egregious discovery abuses. The first is remedying the prejudice. The second is punishing the abuser. The final goal is to deter future similar willful abuses of discovery. *Telectron,* 116 F.R.D. at 135. For the reasons stated in the *Telectron* opinion, the

award of attorneys fees and costs is woefully inadequate for the tasks of remedying, punishing and deterring. Helmac will still be severely hampered in its ability to rebut Roth (plastics)' defenses, and will have lost precious support for its case. No amount of fees and costs could return Helmac to the position it would be in had the destruction never occurred. A choice between the costs of paying attorneys fees as opposed to treble damages may encourage antitrust and Antidumping Act defendants to destroy documents and risk the imposition of fees rather than risk losing the case on the merits.

 The *Telectron* court discarded the option of excluding evidence offered by the defendant that related to the subject matter of the destroyed documents. "This sanction's key weakness, as applied to the present case, derives from the fact that we do not know the precise contours of the destroyed materials." The same can be said in the case at bar. What can be discerned is that the Roths and their associates systematically removed any document that they believed may be harmful to their defense.

> To bar the defense from proffering evidence ... [of such scope] might effectively compel a directed verdict.... Under these circumstances, the parties would incur substantial litigation expenses and the adjudication would consume valuable judicial resources, only to arrive at the same substantive outcome as the entry of default will achieve with much greater efficiency and at substantially lower cost.

*Telectron*, 116 F.R.D. at 135 (citing *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1456 (C.D.Cal.1984)).

The *Telectron* court also refused to permit evidence of the defendant's "obstructive conduct" to be introduced at trial, citing the inadequacy of the remedy for the plaintiff and the deterrence to other wrongdoers, the uncertainty of the jury's reaction, and the distraction of the jury from adjudicating the merits of the claim. Already having accepted proofs on the issue of Roth (plastics)' conduct, I can see no benefit of conducting such a trial within a trial. I too perceive this sanction as an inadequate remedy for Helmac, given the uncertainty surrounding the scope of the destruction.

Finally, the court in *Telectron* declined to impose the sanction against the attorney instead of the party because the destruction was ordered by the defendant's in house counsel. Such a sanction is more inappropriate in this case given the involvement of the top management of Roth (plastics) in the decision to withhold, destroy and deny the flagrant discovery abuses.

In its response to Helmac's motion, Roth (plastics) urges the Court to permit it "to challenge (1) the causation between Helmac's alleged damages and Roth's alleged illegal dumping; and (2) the amount of Helmac's alleged damages." Roth (plastics)' Response to Helmac's Motion for Default, at 13. To prove price suppression damages, to which I have already determined Helmac is entitled, Helmac needs the quotation documents that I have found were willfully destroyed. Its ability to prove the existence and cause of these damages has been severely hampered. Any remedy which permitted Roth (plastics) to challenge causation and damages would remedy inadequately the prejudice suffered by Helmac.

E. Conclusion on Helmac's Motion for Default

Having found that Roth (plastics) willfully destroyed documents which were responsive to Helmac's discovery requests and perceived as potentially damaging to Roth (plastics)' defense of Helmac's antidumping claim, that this destruction severely prejudiced Helmac, and that less severe sanctions will not serve the goals of remedying the prejudice, punishing the willful conduct and deterring similar future conduct, it is the conclusion of this Court that the imposition of a default judgment against Roth (plastics) may be entirely appropriate. The next section of this Opinion will consider the impact that other pending motions have on the granting of a default judgment.

### III.

### OTHER PENDING MOTIONS

A. Roth (plastics)' Motion for Default Judgment

 Roth (plastics) makes its own allegations of discovery abuses in its Motion for

Default Judgment. Helmac allegedly withheld from document production certain files kept only in the office safe of Nicholas McKay. Roth (plastics) also complains about the conduct of a private detective who was hired by Helmac. This detective allegedly broke into and videotaped the Roth Corporation's facility in Lewiston, New York. Finally, Roth (plastics) alleges that Helmac's accountant urged a Helmac employee to remove a single document from the Helmac facility to prevent discovery of the allegedly damaging document by visiting counsel.

Upon a review of the briefs submitted by the parties, it is clear that Roth (plastics)' request for a default must be denied. Applying the *Telectron* standard that was applied above to Helmac's motion, it is clear that Roth (plastics) has suffered little if any prejudice as a result of the alleged conduct, and various less severe sanctions are available to address the goals of remedying, punishing and deterring this conduct. Unlike the Roth (plastics) documents which this Court has found were removed, withheld and ultimately destroyed, the contents of Mr. McKay's files, and the single document handled by Helmac's accountant are available for production. Helmac has offered to make them available and to pay the costs incurred by Roth (plastics) in duplicating discovery efforts. The videotape will not prejudice Roth (plastics) because anything beneficial to Helmac's case which may have been uncovered during the viewing of the videotape would have been discovered during the inspection stipulated to by the parties pursuant to Fed. R.Civ.P. 34.

A myriad of sanctions that are less severe than default are available both to punish Helmac and to deter similar conduct to that which is alleged in Roth (plastics)' motion. A determination of the remedy that is appropriate in this case must await complete development of the record to gauge properly the extent of Helmac's culpability and of Roth (plastics)' prejudice.

■ The fact that default is inappropriate in this instance does not end the analysis, however. The Court must determine whether Roth (plastics) can be defaulted for willfully withholding and destroying documents when Helmac may have engaged in similar conduct. Once again, the record must be developed further to permit a just comparison of the conduct at issue. For instance, Helmac argues that Mr. McKay's office file was not produced as a result of the belief that only duplicates and irrelevant materials were contained therein. It is uncertain whether Helmac's private investigator broke into Roth Corporation's Lewiston facility, or illuminated and videotaped the room from outdoors. The allegations involving Helmac's accountant have been denied outright.

For these reasons, disposition of Helmac's default motion must await an evidentiary hearing during which Roth (plastics)' allegations can be appraised and appropriate remedies can be fashioned to redress the misconduct known to have been committed by Roth (plastics) and alleged to have been perpetrated by Helmac.

### B. Roth (plastics)' Motions in Limine

Roth (plastics) has filed six motions in limine, some of which have an impact upon the damages that Helmac would be able to recover in the event a default judgment is entered in its favor. For some, the Court is prepared to rule. For others, however, additional briefing and argument may be necessary, therefore, to permit final resolution of this case.

#### 1. motions in limine presenting issues decided earlier in the Opinion

The issues presented in some of the motions in limine, however, have been considered and decided in the course of this Opinion. The Motion In Limine to Exclude Evidence Relating to Roth (plastics)' Alleged Discriminatory Price Quotations seeks to exclude evidence of all price quotations that did not result in an actual sale by Roth (plastics) to an American purchaser. Roth (plastics) argues that such quotations are irrelevant because liability and damages under the Antidumping Act of 1916 can result from actual sales only. This argument was rejected above because, a price discrimination claim, for which actual lost sales is an element, is different from a claim brought under the Antidumping Act of 1916. For the reasons

stated above, Roth (plastics)' Motion In Limine to Exclude Evidence Relating to Roth (plastics)' Alleged Discriminatory Price Quotations is DENIED.

The *Motion In Limine to Exclude Evidence of Intent Not Tied to Sales Below Average Variable Cost* argues that the only intent relevant to Helmac's claim is a predatory intent accompanied by the hope of recouping any losses sustained in eliminating Helmac from the market by subsequently charging monopoly prices. As decided above, predatory intent is not the only intent prohibited by the Antidumping Act of 1916. This motion in limine, too, is DENIED.

2. motions in limine whose dispositions can be predicted from earlier discussions

 The disposition of other motions can be predicted from the positions taken by the Court earlier in the Opinion. The Motion in Limine to Exclude Cost Computations Not Made in Accordance With Proper Methodology objects to the methodology used by Helmac in computing Roth (plastics)' production costs. The cost computation is critical to determine whether Roth (plastics) sold its products at a price below the cost at which they were produced. The Court concluded above that Roth (plastics) destroyed the very cost and production analyses which would have enabled Helmac more certainly to establish Roth (plastics)' costs. As admitted in Roth (plastics)' motion, the allocation of variable costs in predatory pricing cases is an inexact science. Helmac's ability to prove that one method of allocation should be used, as opposed to any other method, has been severely hampered by the destruction of production and cost analyses. The Court will not, at this time, hamper further Helmac's efforts to establish Roth (plastics)' costs, especially to limit the prejudice to Roth (plastics). The Court will consider, taking the document destruction into full account, specific objections to Helmac's costs allocations when it comes time to determine either liability or damages. In the meantime, Roth (plastics)' Motion in Limine to Exclude Cost Computations Not Made in Accordance With Proper Methodology is DENIED.

3. motions in limine which require additional briefing before being decided

Before deciding to exclude evidence of statements which are allegedly hearsay, the Court will want to consider Helmac's position. Since this motion need not be decided until trial, and since the entry of a default judgment may obviate the necessity of such a trial, Helmac need not file a response until its default motion ultimately is decided. Disposition of the Motion in Limine to Exclude Hearsay Evidence of Statements Allegedly Made by Actual or Potential Helmac Customers is WITHHELD.

The Motion in Limine to Preclude Helmac from Introducing Damage Evidence Which Incorporates Losses Attributable to Roth's Lawful Conduct argues that Helmac must distinguish between damages resulting from Roth (plastics)' alleged unlawful conduct and damages resulting from lawful competition. "If Helmac is unable to segregate the losses attributable to Roth (plastics)' alleged unlawful conduct from those resulting from Roth (plastics)' lawful activity, defendants request that this Court exclude *all* of Helmac's damage evidence, on the ground that it is inadmissibly speculative." Roth (plastics)' Brief in Support of Motion in Limine to Preclude Helmac from Introducing Damage Evidence Which Incorporates Losses Attributable to Roth's Lawful Conduct, at 2.

It is not necessary to decide this issue before deciding whether Helmac is entitled to a default judgment. Whether judgment is granted or not, the issues presented by this motion in limine must be decided before Helmac is awarded damages, or before trial begins. Before disposing of the motion, the Court will need to review Helmac's response to the legal arguments. I will note, however, that, the Court is not likely to exclude the evidence if Helmac's inability to distinguish damages in the manner urged by Roth (plastics) in its motion in limine results from Roth (plastics)' document destruction. Disposition of this Motion is WITHHELD pending final decision on the merits of Helmac's Motion for Default Judgment, and the subsequent filing of response and reply briefs.

Finally, there is Roth (plastics)' Motion in Limine to Exclude Evidence Relating to the Sale of Products Manufactured or Assembled in the United States. Roth (plastics) argues that many of the lint removal devices sold or offered for sale in the United States were produced in Lewiston, New York, and the sale of these devices is not subject to the Antidumping Act of 1916. During closing arguments in the evidentiary hearing regarding Helmac's default motion, Helmac's attorney argued that the Act applies to these products as well because the bulk of their production occurs in Canada, and the business is run out of Canada. No other response has been filed by Helmac, however, and the Court cannot make a determination without additional briefing. Resolution of this issue may affect the calculation of the damages which Helmac will recover. It will not impact on Helmac's entitlement to a default judgment. The parties may wait to file response and reply briefs after the Court decides whether a default judgment is warranted.

## IV. CONCLUSION

The Court will take this opportunity to distinguish the motions which remain pending after entry of this Opinion. The Court's primary concern is redressing the egregious violations of the discovery rules which resulted from Roth (plastics)' willful destruction of documents. An application of the *Telectron* standard indicates that the entry of a default judgment may be justified and necessary, but this cannot be determined until the Court has heard evidence regarding the allegations of serious misconduct made against Helmac by Roth (plastics) in its own motion for default judgment. While I already have determined that a dismissal of Helmac's claims is not warranted even if the allegations are true, it may be that the imposition of a default judgment against Roth (plastics) would be inappropriate given Helmac's behavior. Thus, decision on the merits of entering a default judgment must await additional consideration of Roth (plastics)' Motion for Default.

The motions in limine that have not been decided, however, do not affect the merits of entering a default judgment in Helmac's favor, although they must be decided before a determination of Helmac's damages is made.

Several motions have been discussed in this Opinion. The following is a summary of the disposition made of each motion:

1. Eric Roth's Motion for Summary Judgment is GRANTED.
2. Disposition of Roth (plastics)' Motion for Default Judgment is WITHHELD pending an evidentiary hearing scheduled for August, 1992 at 8:00.
3. Disposition of Helmac's Motion for Default Judgment is WITHHELD pending the evidentiary hearing and consideration of Roth (plastics)' default motion.
4. The following Motions in Limine are DENIED:
 a. Motion In Limine to Exclude Evidence Relating to Roth (plastics)' Alleged Discriminatory Price Quotations;
 b. Motion In Limine to Exclude Evidence of Intent Not Tied to Sales Below Average Variable Cost;
 c. Motion in Limine to Exclude Cost Computations Not Made in Accordance With Proper Methodology;
5. Disposition of the following Motions in Limine is WITHHELD:
 a. Motion in Limine to Exclude Hearsay Evidence of Statements Allegedly Made by Actual or Potential Helmac Customers;
 b. Motion in Limine to Preclude Helmac from Introducing Damage Evidence Which Incorporates Losses Attributable to Roth's Lawful Conduct.

The Court would like to decide, before the middle of August, whether to enter a default judgment in Helmac's favor. Therefore, preparations must start immediately for the holding of an evidentiary hearing on Roth (plastics)' Motion for Default. On July 23, 1992 at 1:30 p.m., the Court will interrupt an extended trial to hold a final pretrial conference for the evidentiary hearing in this matter to expedite this process.

SO ORDERED.