**D.E. ROGERS ASSOCIATES, INC., a Michigan corporation; and Michigan Specialties Manufacturing Company, a Michigan corporation, Plaintiffs-Appellants,**

v.

**GARDNER–DENVER COMPANY, Defendant-Appellee.**

No. 81–1314.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 23, 1982.

Decided Oct. 21, 1983.

Rehearing and Rehearing En Banc Denied Jan. 18, 1984.

Roger K. Timm, Dykema, Gossett, Spencer, Goodnow & Trigg, Robert G. Cutler (argued), Detroit, Mich., for defendant-appellee.

Larry J. Saylor, Miller, Canfield, Paddock & Stone, Gregory L. Curtner (argued), Detroit, Mich., for plaintiffs-appellants.

Before MARTIN, Circuit Judge, BROWN, Senior Circuit Judge, and NEESE, Senior District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

In this private antitrust suit brought by D.E. Rogers Associates, Inc. seeking treble damages from Gardner-Denver Co., Rogers claims Gardner-Denver violated section 2 of the Sherman Act, 15 U.S.C. § 2, and section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) when it reduced its prices for ratchet wrench parts sold in quantities of five or more to or below prices offered by Rogers for similar products. In a trial to the court without a jury, the district court dismissed the case following presentation of Rogers' evidence. We affirm.

Gardner-Denver, producers and marketers of a broad range of industrial tools, is the largest manufacturer of ratchet wrenches and their replacement parts in the United States. A ratchet wrench is a hand-held tool which uses pneumatic power to "set" or tighten mechanical nuts onto bolts or studs. It consists of a motor plus an attachment. It is most commonly used in the industrial mass-production of products such as automobiles and aircraft.

Until 1955, Keller Tool Company, the sole patent holder, monopolized the manufacture of ratchet wrenches. When the patent expired in 1955, Keller was acquired by Gardner-Denver and became the latter's Pneutronics Division. It continued to manufacture and market the wrenches and parts.

In 1964, Donald Rogers, a former Gardner-Denver employee, formed D.E. Rogers, Inc. and in conjunction with Michigan Specialties Manufacturing Company, a related concern, began selling ratchet wrench parts. Michigan Specialties manufactures many of the products sold by Rogers, although in some cases it relies on parts manufactured by others and in other cases it "jobs out" part of the manufacturing process to other manufacturers. Recently, Rogers has begun marketing a complete ratchet wrench tool.

From 1964 until late in 1971, Rogers and Gardner-Denver competed amicably in the ratchet wrench parts market. Throughout this period, Rogers was able to set its prices approximately thirty percent below Gardner-Denver's prices for the same or similar products. As testimony to its success, Rogers saw its gross sales grow from approximately $26,000 in 1964 to $300,670 in fiscal 1970.

On August 23, 1971, Gardner-Denver initiated a dual pricing system for ratchet wrench parts and components. Pivotal to the system was the "blue list." The blue list contained parts which, if purchased in quantities of five or more, were available for substantially less than standard "white list" prices. The parts listed were, with a few exceptions, those parts also sold by Rogers. Blue list prices initially averaged sixty-four percent of white list prices and approximately nine percent below Rogers' then current prices for the same items. The blue list was distributed only to Gardner-Denver sales employees.

On September 29, 1971, Rogers responded to the blue list with its own revised price list. Rogers new prices were set approximately twenty percent below Gardner-Denver's blue list prices. These relative prices existed for five months until, on February 28, 1972, Gardner-Denver reduced its blue list prices further. The new prices were either equal to or, in some cases, less than Rogers'. Simultaneously, Gardner-Denver increased its standard, white list prices about nine percent. Two weeks later, on March 15, Rogers further reduced its prices where necessary to match Gardner-Denver's blue list prices. It also introduced a two percent cash discount. Approximately twenty-five months later, on May 1, 1974,

* Honorable C.G. Neese, Senior District Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

Gardner-Denver increased its blue list prices five percent. On September 28, 1976, use of the blue list was discontinued.

It is unclear from the record the precise manner in which Gardner-Denver utilized its blue list. It is certain that not every purchaser of five or more of the blue-listed parts received the blue list discount; nor were purchasers of less than five parts consistently billed at white list rates. Rogers' expert testified that an analysis of Gardner-Denver's sales invoices for 1975 showed white list prices charged in twenty-four percent of all purchases of five parts or more and blue list prices charged in twenty-two percent of all sales of less than five parts.

It is Rogers' position that the blue list was specifically designed to eliminate competition in the ratchet wrench parts market. According to Rogers, Gardner-Denver's blue list was below-cost pricing financed by company profits in other product areas. Financial resources derived from its diversified interests permitted this flexibility. By dropping its prices so precipitously, Rogers continues, Gardner-Denver hoped to drive its smaller, financially weaker competitors out of the market. As a result of the blue list, Rogers asserts, it lost profits and sales, was prevented from expanding its product line, and was, therefore, foreclosed from operating as a competitive force in the market.

The district court based its decision to dismiss the case on several factors. First, it found that Rogers had failed to prove Gardner-Denver's monopoly power in the relevant market. The relevant market, as held by the court, was not limited to ratchet wrench replacement parts but, rather, included mechanical "nutsetters" of all kinds. Although there was no evidence introduced as to market share in a market so defined, the court estimated that Gardner-Denver's share was from ten to fifteen percent. Citing the ease with which Rogers itself entered the market, the court further concluded that there existed no barriers to entry.

In addition the court held that Rogers had failed to prove that whatever sales and profit losses were incurred during the time

Gardner-Denver's dual price list was in effect were the result of Gardner-Denver's actions. Rather, the court held, there were many other factors such as internal and organizational difficulties, other competitors, and quality control and distribution problems plaguing Rogers at the time which could easily have caused its losses. Next, the court found insufficient evidence of a direct or indirect nature of predatory intent on Gardner-Denver's part to support Rogers' allegations. The court employed a cost-based analysis for proof of intent by which Rogers was required to demonstrate Gardner-Denver's prices were below its average variable cost. This, the court found, Rogers was unable to do. Moreover, continued the court, it was a close question as to whether Gardner-Denver's prices were below average total cost.

■ Finally, the court held that the analysis in primary line price discrimination cases under section 2(a) of the Robinson-Patman Act is in all significant respects equivalent to the analysis undertaken in section 2 Sherman Act claims. Having found no proof of predatory pricing for Sherman Act purposes, the court held that Rogers had failed to prove the requisite anticompetitive effect for the Robinson-Patman Act claims.

The district court dismissed the case pursuant to Federal Rule of Civil Procedure 41(b). As this operates as an adjudication upon the merits, it is subject to the clearly erroneous standard of review. *Simpson v. United States,* 454 F.2d 691, 692 (6th Cir. 1972), *Marr v. Rife,* 503 F.2d 735, 740 (6th Cir.1974). That standard in a case such as this requires us to affirm the findings of the district court unless, after viewing all the evidence, we are left with "the definite and firm conviction that a mistake has been made." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). "It is not enough . . . that we might give the facts another construction, resolve the ambiguities differently, and reach a conclusion different from that of the district judge. Such a conclusion on our part does not

make the finding 'clearly erroneous.' " *Strickler v. Pfister Associated Growers, Inc.,* 319 F.2d 788, 790 (6th Cir.1963). Rather, Rogers must persuade us that no plausible view of the evidence would support the court's findings. This he has failed to do because of his inability to prove either directly or indirectly by a preponderance of the evidence that Gardner-Denver was engaged in predatory pricing. We find insufficient evidence of either a subjective or an objective, cost-based nature that Gardner-Denver's dual-pricing strategy was designed to discipline or eliminate competition. Because of this we need not reach the otherwise important issues of relevant market and causation, both of which were considered and disposed of below.

■ To prove Gardner-Denver attempted to monopolize the ratchet wrench parts market, Rogers must prove that Gardner-Denver "engaged in anticompetitive conduct with the specific intent to monopolize and that the attempt had a dangerous probability of success." *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 823 (6th Cir.1982) *quoting United States v. Dairymen, Inc.,* 660 F.2d 192, 194 (6th Cir. 1981). *Accord William Inglis v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir. 1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). As the Ninth Circuit in *Inglis* has carefully explained, the relationship between act and intent in attempted monopolization claims is a close one. On the one hand, direct evidence of specific intent to monopolize, without corresponding evidence of some act taken to achieve the goal, will never establish an antitrust violation. *Inglis,* 668 F.2d at 1028, n. 7. On the other, evidence of anticompetitive conduct may be used to support a finding of intent where direct evidence of intent is unavailable. *Id.* at 1030. In this case, the district court found "no proof in the record of an intent to monopolize." The record supports that finding.

■ In a review of the record for direct evidence of specific intent to monopolize, we find actions which are at best ambiguous in their implications. Rogers points to Gardner-Denver correspondence referring to the plaintiff as a "pirate" manufacturer. However, other evidence, including testimony from Mr. Rogers himself, established that the term would be and was often used to refer to companies, like Rogers, which manufactured replacement or substitutes for equipment originally manufactured by another firm. Though the term could be used in a belligerent sense, it might as easily be employed in a neutral context to, we think, accurately describe a given manufacturing concern. That the district court concluded that it was used in this latter context in this case is not clearly erroneous.

Nor does the fact that Gardner-Denver's price cuts were directed at Rogers or other competitors conclusively prove anticompetitive intent.

It is not anticompetitive for a company to reduce prices to meet lower prices already being charged by competitors. Indeed, "[t]o force a company to maintain non-competitive prices would be to turn the antitrust laws on their head. *ILC Peripherals v. International Business Machines Corp.,* 458 F.Supp. 423, 433 (N.D. Cal.1978), *aff'd sub nom. Memorex v. International Business Machines Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981).

*Richter Concrete,* 691 F.2d at 826. As Judge Kennedy stated in her dissent in *Borden v. FTC,* 674 F.2d 498, 519 (6th Cir. 1982), "[i]t is simply good business practice, not a use of monopoly power, to lower prices only where the competition is stiff." "[Desire] to win the competitive struggle . . . without more, is not unlawful." *Northeastern Telephone,* 651 F.2d at 85.

Without direct evidence of intent, it fell to Rogers to prove by inference from anticompetitive conduct the requisite intent necessary to support a violation. In fact, Rogers' Sherman and Robinson-Patman Act claims rely entirely on what Rogers claims was predatory pricing by Gardner-Denver. It alleges that Gardner-Denver's blue list

was an attempt to drive the prices of its smaller, financially weaker competition low enough to ruin it, whereupon Gardner-Denver would raise its prices and recoup its losses. We agree with the district court that Rogers failed to prove that Gardner-Denver's pricing policy was predatory.

In *Richter Concrete,* predatory pricing was defined as follows:

> Pricing is predatory when a company foregoes short-term profits in order to develop a market position such that the company can later raise prices and recoup profits. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1031 (9th Cir.1981). Predatory pricing differs from healthy competitive pricing in its *motive*: "a predator by his pricing practices seeks 'to impose losses on other firms, not garner gains for itself.'" *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 853–54 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981) (footnote omitted). Price reductions that constitute a legitimate, competitive response to market conditions are not predatory. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1031–32 (9th Cir.1981).

*Id.* at 823 (emphasis added). Motive being the distinguishing characteristic of predatory pricing, the courts and others have developed various methods of ascertaining motive when, as here, direct evidence is inadequate or unavailable. *Id.* Foremost amongst these methods is an objective cost-based test first advocated by Professors Areeda and Turner. *See* Areeda & Turner, *Predatory Pricing & Related Practices Under the Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). Generally speaking, the Areeda/Turner test relies on the relationship between a product's marginal cost and its price to determine whether or not the firm which sells the product is engaged in anticompetitive behavior. Because of the difficulty inherent in accurately determining marginal cost, the Areeda/Turner test uses average variable cost as a surrogate. Areeda & Turner, *supra,* at 717. Pricing at or above marginal or average variable cost, they argue, should be conclusively presumed acceptable while pricing below that level conclusively presumed illegal or predatory. *Id.* at 711. *See Inglis,* 688 F.2d at 1032.

This standard has not been adopted unqualifiedly. *See Richter Concrete,* 691 F.2d at 823; *Inglis,* 668 F.2d at 1032. Although the courts have accepted the marginal or average variable cost standard as an indicator of intent, many allow for consideration of other factors indicative of predation. A leading example of this hybrid approach is that taken by the Ninth Circuit in *Inglis.* There the position was taken that although average variable cost is a generally reliable indicator, there are market situations where a rational firm would find it prudent to sell below its average variable cost. *See id.* at 1035, n. 32. Conversely, it acknowledges that in certain situations, a firm selling above average variable cost could be guilty of predation. *See id.* at 1035. Consequently, it focuses "on what a rational firm would have expected its prices to accomplish." *Id.* at 1034. Accordingly, it permits the introduction of any evidence, in addition to cost-price figures, to illuminate the rationale behind the defendant's pricing policy.

> [W]e hold that to establish predator pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.

*Id.* at 1035–36. *Cf. Northeastern Telephone,* 651 F.2d at 88, *Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1281 (8th Cir. 1981).

Although this circuit has not had an occasion to enunciate a specific cost-based test for predation, *see Richter Concrete,* 691 F.2d at 824, we feel that the Ninth Circuit's modified version of the Areeda/Turner test is appropriate. Applying that standard to the case before us, we agree with the district court's finding that Rogers failed to introduce sufficient evidence of either a direct or indirect nature to prove that Gardner-Denver's motives in establishing the blue list were predatory.

To review the evidence, we first reiterate that the record lacks any conclusive or convincing direct evidence bearing on the issue of motive. Rogers' case is not helped, moreover, by a cost-base analysis. Parks, an accountant called as an expert witness by Rogers, testifying as to the extensive examination and analysis he undertook on Gardner-Denver's financial records, could state only that Gardner-Denver sold "in the vicinity of" average variable cost; that he could not say "with specific confidence" that they sold beneath average variable costs during the entire period. The district court accepted this testimony as proof that Gardner-Denver's prices during the period were not below average variable cost. Given the absence of any other evidence bearing on the issue, we do not think the court's conclusion clearly erroneous. It thus fell to Rogers to rebut through the introduction of additional evidence the presumption which arises from such a finding that the defendant was not predatorily pricing. *Inglis,* 668 F.2d at 1035–36. This, as we have already discussed, Rogers could not do.

Interestingly, Rogers argues against our acceptance of Parks' cost analysis. Specifically, it contends that Parks based his calculations of costprice relationships on his "accountant's" definition of variable and fixed costs. Those calculations yielded the conclusions discussed above. Rogers contends, however, that if we follow the Areeda/Turner test for predation, we must also adopt Areeda's and Turner's "economists'" definition of variable and fixed cost. Rogers then points to Parks' testimony that he had used this "more inclusive" definition of variable costs, Gardner-Denver's average

variable costs would have significantly exceeded its price for ratchet wrench parts.

Despite Rogers' dire prediction that failure to employ the Areeda/Turner broad definition of variable cost would render a plaintiff's task of satisfying the test well-nigh impossible, we decline to require rigid categories of variable and fixed costs be applied in every predatory pricing case. Beyond the general statement that fixed costs are not affected by output while variable costs are, it is impossible to determine in advance and outside the specific factual context the variability of any particular expense. *Inglis,* 668 F.2d at 1037. That type of fact-specific, tailored inquiry into cost allocation by the defendant seller is crucial because, as the district court stated, costprice analysis is but a "surrogate" for intent. To determine anticompetitive intent with any degree of certainty or justification from objective examination of an alleged predator's pricing policy, one must be certain that the categorization of costs reflect the actual situation facing the seller. That will vary with the facts of each case. *Id.* at 1038.

Parks' general definitions of fixed and variable costs are in accord with those proposed by Areeda and Turner and adopted by us. Beyond these broad outlines, however, Parks used an "accountant's," as opposed to an "economist's" definitions to more precisely allocate expenses. As plaintiff's exhibit 149, a letter from Parks to Rogers' counsel, reflects, Parks' allocative process was indepth, detailed, and thorough and based upon all the financial information available to Gardner-Denver at the time it made its pricing decisions. Presumably this was precisely the task Rogers' counsel set for Parks, although it no doubt expected a different result. Be that as it may, we think the cost allocation method employed by Parks produced results which, insofar as they reflect a comprehensive analysis of the economic horizon facing Gardner-Denver at the time it instituted the blue list, produced a nearly accurate projection of the cost factors facing Gardner-Denver. Because the ascertainment of Gardner-Denver's intent is the signal goal

**1438**

of this deductive process, only those factors are important. Because Parks' results do not conclusively prove below average variable cost pricing, we find that the district court's determination that the defendant's motives were nonpredatory was correct.

■ Rogers' monopolization claim fails as well. To prove monopolization, Rogers was required to prove Gardner-Denver's "(1) possession of monopoly power in the relevant market and (2) its willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product business acumen, or historic accident." *United States v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Assuming, contrary to the district court's finding but without deciding, that Gardner-Denver possessed monopoly power in the relevant market and that the power was lawfully acquired, Rogers, on the record before us, has failed to prove that Gardner-Denver willfully used its monpoly power to maintain its position.

■ Whether or not a monopolist has grown and developed as a consequence of willful acts directed at maintaining its monopoly or, in the alternative, as a consequence of a superior product, business acumen, or historic accident is not always an easy question to answer. It is made more difficult by the fact that the acts or practices upon which a monopolization claim may rest need not be in themselves illegal. *Borden,* 674 F.2d at 513; *California Computer Products v. International Business Machines,* 613 F.2d 727, 735 (9th Cir.1979). Nor is it necessary that in commission of those acts, a monopolist have had the specific intent to eliminate competition. *Id.; Dimmitt Agri Industries, Inc. v. CPC International, Inc.,* 679 F.2d 516, 531 (5th Cir. 1982), *cert. denied,* — U.S. —, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). Nevertheless, not every act by a monopolist which has lawfully acquired its monopoly power violates section 2. *California Computer Products,* 613 F.2d at 736 n. 7. "The otherwise lawful conduct forbidden by section 2 ... is a monopolist's use of *monopoly* power in order to maintain or improve its position in the market." *Borden,* 674 F.2d at 518 (em-

phasis in original). *See United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Generally speaking, a monopolist uses its monopoly power in a manner prohibited by section 2 when it acts "in an unreasonably exclusionary," *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843 at 853, or "anticompetitive," *Borden,* 674 F.2d at 518, manner towards its rivals. *See California Computer Products,* 613 F.2d at 735 ("plaintiff must show that the defendant's acts 'unnecessarily excluded competition' from the relevant market").

■ In this case, our finding that Gardner-Denver did not engage in predatory pricing compels the conclusion that there was nothing unreasonably exclusionary or anticompetitive in Gardner-Denver's pricing activity. We reiterate that "it is not anticompetitive for a company to reduce prices to meet lower prices already being charged by competitors." *Richter Concrete,* 691 F.2d at 826. *Superturf,* 660 F.2d at 1281. As we found in our analysis of the claim of attempted monopolization, despite substantial price reductions, Gardner-Denver continued to price at or above marginal cost. Marginal cost pricing, the "socially optimal" level, Areeda & Turner, *supra* at 711, is consistent with competition on the merits, however. *California Computer Products,* 613 F.2d at 743. "Where the opportunity exists to increase or protect market share profitably by offering equivalent or superior performance at a lower price, even a virtual monopolist may do so." *Id.* at 742.

Our analysis brings us, finally, to Rogers' price discrimination claim under section 2(a) of the Robinson-Patman Act. The district court concluded that in this case, the legal analysis of a section 2(a) claim is equivalent to that of a section 2 claim under the Sherman Act. Having found no violation of the Sherman Act, the Court dismissed the section 2(a) claim. We agree.

■ To successfully prove price discrimination, Rogers was required to prove that (1) Gardner-Denver discriminated "in price between different purchasers of commodi-

ties of like grade and quality," and (2) the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 13(a). *See FTC v. Morton Salt Co.*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). We take as given that in utilizing the blue list, Gardner-Denver satisfied the first requirement. Our analysis here, therefore, focuses on the anti-competitive effect of the defendant's actions.

Rogers' complaint alleged primary line, non-geographic price discrimination. Where, as here, the plaintiff in a primary line case has not undertaken a general market analysis to prove anticompetitive effect, many of the courts to have recently considered Robinson-Patman Act claims look to evidence of predatory intent from which to infer injury to competition. *See, e.g., Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 696–98, 87 S.Ct. 1326, 1332–34, 18 L.Ed.2d 406 (1967); *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 722–23 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp.*, 551 F.2d 790, 798 (10th Cir.1977), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *Inglis*, 668 F.2d at 1040. These same courts, moreover, agree that the principles behind proof of predatory intent in Sherman Act claims are "equally applicable" to proof of predatory intent in a Robinson-Patman Act suit. *Inglis*, 668 F.2d at 1041 and cases cited therein. "Where a price differential threatens a primary line injury," said the Ninth Circuit, "section 2 of the Sherman Act ... and section 2(a) of the Clayton Act ... are directed at the same economic evil and have the same substantive content." *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). *Accord, Pacific Engineering & Production*, 551 F.2d at 798.

In this case, there is no evidence of anti-competitive effect, direct or inferential, in the record. Rogers claims that as a result of defendant's predatory actions, it lost business and profits, both of which, it further claims, directly evidenced the requisite effect on competition. We disagree. Without more, loss of business and profits is as likely the result of honest competition as it is the result of illegal conduct. As the Fifth Circuit stated in *International Air Industries*, a case factually very similar to the case before this court,

It is settled law that a mere diversion of business from one competitor to another does not signify detriment to competition on the seller level.... Mere loss of profits shows no more than that ... [the plaintiff] ... was forced to charge a competitive price because it faced competition. Similarly, the large size of the discriminator and even the fact that its sales increased during the period of discrimination would not necessarily make out a case. *Anheuser-Busch, Inc. v. FTC*, 289 F.2d 835, 839, 843 (7th Cir.1961). It is possible for damage to a single competitor to meet the statutory requirements, *see Borden Co. v. FTC*, 381 F.2d 175 (5th Cir.1967), but a showing of more than competitive pricing and a shift of customers is necessary. Evidence of certain types of predatory conduct, we feel, would fulfill the requirements.

517 F.2d at 721–22 (footnotes omitted).

What Rogers cannot prove directly it is equally unsuccessful proving inferentially. Accepting as we do the propositions that a Robinson-Patman Act plaintiff may prove anticompetitive effect inferentially from proof of a defendant's anticompetitive intent, and that proof of anticompetitive intent in section 2(a) cases is no different from its proof in Sherman Act cases, we agree with the district court that in this case Rogers' failure to prove anticompetitive intent directly, *supra* or indirectly through proof of pricing below average variable cost is fatal to its price discrimination claim.

Contrary to Rogers' arguments here, we do not think that equating the proof required to show a Sherman Act violation with that necessary to show a violation of the Robinson-Patman Act will emasculate

the latter provision. Only in cases such as this, where the section 2(a) plaintiff is forced to rely on proof of predatory intent to show that the defendant's discriminatory pricing did or might have harmed competition will the two provisions appear as óne. Be that as it may, we are not prepared to punish under any guise conduct which we conclude was well within the competitive boundaries the antitrust laws were enacted to protect.

The decision of the district court dismissing all claims by Rogers against Gardner-Denver is affirmed.