HELMAC PRODUCTS CORPORATION,
a Michigan corporation, Plaintiff,

v.

ROTH (PLASTICS) CORPORATION, a
Canadian corporation, Defendant.

Civ. A. No. 84–CV–8225–FL.

United States District Court,
E.D. Michigan, S.D.,
at Flint.

Jan. 7, 1993.

Opinion Denying Motions for
Reconsideration and to Stay Discovery
Feb. 18, 1993.

David A. Ettinger, James K. Robinson, Honigman, Miller, Schwartz & Cohn, Detroit, MI, Thomas J. Kenny, Raymond & Dillon, Southfield, MI, for plaintiff.

Lori Silsbury, Roger K. Timm, Dykema Gossett, Detroit, MI, for defendant.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

This lawsuit concerns Helmac's damages for Roth (Plastics)' violation of the Anti–Dumping Act of 1916, Act of September 8, 1916, 39 Stat. 798, 15 U.S.C. § 72 (1980) ("the Act" or "the 1916 Act").

Pending before the Court are the following:

(1) whether there will be a jury trial on damages;

(2) Helmac's Motion in Limine to Exclude Evidence Relating to Competitive Effects;

(3) Roth's Motion in Limine to Preclude Helmac from Introducing Damage Evidence Which Incorporates Losses Attributable to Roth's Lawful Conduct;

(4) Roth's Motion Regarding the Appropriate Choice of Damages Methodology;

(5) Roth's Motion in Limine to Exclude Evidence Relating to the Sale of Products

Manufactured or Assembled in the United States;

(6) Helmac's Motion in Limine to Exclude Evidence Relating to Helmac's Motivation for Bringing Suit;

(7) Helmac's Motion in Limine to Exclude David Ettinger from Roth Plastics' Witness List;

(8) Roth's Motion in Limine to Exclude Hearsay Evidence of Statements Allegedly made by Actual or Potential Helmac Customers.

## I. *Trial on Damages*

### A. Is a Jury Trial Necessary?

Helmac seeks a default judgment for damages, claiming that Roth's prior document destruction supports such a finding. The Court finds sufficient information remains available for Helmac to demonstrate damages to a jury. For example, Helmac has been able to produce an expert's opinion calculating the damages. Roth has obtained an expert with different views. There is no reason to decide the factual question of damages without recourse to a trial.

Where necessary documents are unavailable, this Order establishes how Helmac can proceed.

### B. Must Intent Be Proven at Trial?

█ Intent is an element of a violation of the Anti–Dumping Act of 1916. Order of July 14, 1992, 814 F.Supp. 560 ("Order"). This Court has already issued a default judgment against Roth for violating the Act. This issue need not be proven at trial to calculate damages. Helmac also argues convincingly that it would unduly burden Helmac given Roth's destruction of documents that might otherwise show intent. The jury will be instructed that the Court has already determined that Roth has shown the requisite intent for liability under the Act.

## II. *Calculation of Damages*

### A. No Damages for Pricing Above Average Variable Cost

█ The incremental damages due to lawful and unlawful pricing must be separated.

As even Helmac acknowledges, "[a]s a general principle, courts evaluating amounts of claims have agreed that only damages attributable to unlawful conduct should be recovered." Helmac's Brief on its Damages Methodology at 10.

Helmac contends that since this Court has ruled that the 1916 Act requires proof of intent to injure, then Roth violated the Act even when it set prices at or above cost. This Court cannot determine how damages could be assessed, however, when Roth violated the Act but did not price below cost. The alternative that Helmac posits is to count as damages all lost profits incurred by Helmac as a result of competition by Roth during the years in question.

Nothing in the language of the 1916 Act supports such an outcome, and the public policy implications are considerable. The Act's plain language refers to "a price substantially less than the actual market value or wholesale price." Regardless of how the Act is interpreted, it is somewhat of a stretch to suggest the Act justifies *damages* when Roth's prices equalled or exceeded average variable cost.

In addition, this outcome seems draconian and inconsistent with the body of foreign trade laws of which the Act is merely one part. *See e.g.*, 19 U.S.C. § 2901(a) (West Supp.1992) ("The overall trade negotiating objectives of the United States are to obtain—(1) more open, equitable, and reciprocal market access; (2) the reduction or elimination of barriers and other trade-distorting policies and practices; and (3) a more effective system of international trading disciplines and procedures.").

Foreign competitors found liable under the Act would be liable for treble damages on the entire effect of their competition in the United States market. The result would surely stifle competition beyond that intended by Congress when it enacted this admittedly protectionist statute. Therefore, this Court shall limit damages to those cases where Roth set prices below average variable cost.

### B. The Admissibility of Evidence Concerning the Calculation of Damages

Helmac postulates that as a result of Roth's illegal pricing, a customer might have

told Helmac its prices were higher than Roth's, but not by how much. As a result, Helmac would have lowered prices ("price suppression") and lost profits. Helmac claims that "the entire amount of price suppression is still properly viewed as due to Roth Plastics' unlawful activities." *Id.*, at 11.

The Court disagrees for the reasons discussed *supra* regarding damages for lawful pricing. Only the extent of Helmac's price suppression that is a result of Roth's illegal prices should constitute damages. For example, suppose that Helmac charged $2 per unit and Roth charged $1.50 per unit. Helmac then lowered its price to $1.25 per unit and obtained the contract. First, a jury would determine the extent to which Roth illegally lowered its price, based upon an analysis of Roth's cost data. E.g., the jury might find that Roth illegally shaved .25 cents off the price per unit. Then, the jury would determine what Helmac would have done had Roth's price been set without violation of law, e.g., if Roth's unit had been priced at $1.75. A reasonable jury in this example could find any of the following: that Helmac would not have lowered its price at all; that it would have lowered its price to $1.75 per unit, $1.50 per unit, or any other amount, depending upon the evidence presented of Helmac's pricing decisions. The jury need not presume, as Helmac would have it, that the entire price suppression of fifty cents per unit constitutes damages.

■ Helmac also claims, however, that Roth's prior destruction of price quotation sheets severely hampers the calculation of price suppression. This Court previously stated that it would not be likely to exclude Helmac's evidence of price suppression if Helmac could not distinguish damages result-ing from illegal conduct from losses resulting from legal competition. *See Order.* The Court's perspective on this issue has not changed, and it therefore allows Helmac to claim as damages the entire amount of price suppression or of the loss of a contract *in those cases* when Roth's prices are unknown due to document destruction. However, in those cases where Roth price data is available, it would be unreasonable to punish Roth by denying Roth the opportunity to prove that some of Helmac's losses resulted from legal competition.

Finally, the issue remains how the Court will instruct the jury to consider the effect of other factors on the loss of particular Helmac contracts, e.g., problems with Helmac's sales staff or advertising effectiveness. Helmac requests that the Court adopt the "substantial factor" test of *Irvin Industries, Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241 (2d Cir.1992). The Court agrees that the substantial factor test is a reasonable one to apply, but not in the way that Helmac appears to suggest in its brief, Helmac's Brief 13.

■ The Court will instruct the jury that Helmac can recover for every contract for which it can show (1) that it charged a lower price to obtain the contract or lost a contract to Roth and (2) that Roth's quotation of an illegal price was a substantial factor in Helmac's loss of the contract or price suppression. The possibility exists that the jury will find that on any particular contract the extent of the Roth illegal price cut was so small, or the mismanagement of a Helmac sales account so extreme, that the Roth illegal pricing did not constitute a substantial factor in Helmac's loss of a contract. In those cases, Helmac will not recover.[1]

1. Roth's request in its reply brief that this Court limit recovery by Helmac to those customers as to which Roth made actual sales in accordance with Robinson–Patman Act, 15 U.S.C. § 13 (1988), case law is DENIED. As Roth notes, this Court previously decided this issue in the July 14, 1992 Order. This Court acknowledges that its analysis of the differences between Robinson–Patman "secondary line" cases and Anti–Dumping Act cases does not apply to "primary line" predatory pricing cases under Robinson–Patman, *see* Defendant Roth (Plastics) Corporation's Response Brief Regarding Damages Methodology at

8. However, the statutory language in Robinson–Patman limiting recovery to "purchasers" is not present in the Anti–Dumping Act of 1916. The Anti–Dumping Act's language, "it shall be unlawful for any person ... to import, sell or cause to be imported or sold ..." does not require that the defendant actually have made a sale to a particular customer to have violated the Act regarding that customer. Moreover, as the economic analysis in the text demonstrates, price suppression harm can be caused without Roth's having made the sale.

■ Where the jury does find an illegal price cut to constitute a substantial factor in Helmac's loss, the extent of Helmac's recovery will be (1) in cases where Roth's price data is missing due to document destruction, the entire amount of the loss; (2) in cases where Roth's price data is available, the extent of the loss that the jury attributes to the illegal pricing.[2]

The total recovery will be trebled in accordance with the statute.

### C. How To Define Average Variable Cost

■ Helmac and Roth offer alternative approaches to defining average variable cost. Since this Court has determined that the average variable cost will play a critical role in calculating damages, this dispute must be resolved. The Court does not believe that oral testimony is necessary on this subject. Both sides have briefed the issue extensively and provided affidavits of experts.

Both legal and factual issues divide the parties over the definition of average variable cost. The legal issues shall be resolved by this Order. The factual issues shall be resolved by the jury. There is no reason why a jury is not competent to determine which expert has analyzed data in a more persuasive manner. No rule of evidence requires this issue to be handled by the Court in an evidentiary hearing; therefore the following issues shall be determined by the jury:

(1) the calculation of labor costs as determined by an estimate of labor productivity. *See Helmac's Index of Exhibits* at 9 (Affidavit of John Pisarkiewicz, Jr.) (discussing disagreement with Roth's expert).

(2) the calculation of selling and delivery expenses as a percentage of material costs, *id.*

(3) the calculation of general and administrative expenses as a percentage of material costs, *id.,* at 10.

The method of allocation of overhead and labor costs to calculate average variable cost sufficiently implicates legal concepts to require this Court's ruling.

Roth's approach to cost allocates overhead to products in proportion to labor and materials costs. Helmac allocates overhead to products in proportion to revenue. Roth employs an accountant's methodology; whereas, Helmac employs an economist's methodology. In *D.E. Rogers Assoc. v. Gardner–Denver Co.,* 718 F.2d 1431, 1436–67 (6th Cir.1983), an anti-trust case, the Sixth Circuit affirmed a trial court's finding for defendant. As part of that decision, the court held that the district court did not commit reversible error in adopting an accountant's, as opposed to an economist's, calculation of fixed and variable costs.

The court noted that the accountant's "definitions of fixed and variable costs are in accord with those proposed by Areeda and Turner and adopted by us." *Id.* at 1437. Also, the court found that the allocation method reflected "a comprehensive analysis of the economic horizon facing Gardner–Denver at the time it instituted the [prices at issue] ... Because the ascertainment of Gardener–Denver's intent is the signal goal of this deductive process, only those factors are important." *Id.*

As in *D.E. Rogers,* Roth's accountant's calculation makes economic sense. This calculation allocates the costs according to the use of labor and materials. A product that takes more man-hours to make is treated as costing more. Helmac suggests this allocation does not reflect how a rational producer would allocate costs. What can be said for the Helmac position?

Helmac contends that one should measure costs of particular products by looking to the revenue streams of those products. A rational business will choose to allocate production to goods with higher profit margins. When a rational business cannot obtain a price for a good that equals the cost of producing that good, the business will choose to forego production and thereby reduce variable costs for that good to nothing. Similarly, a rational business faced with customer demand that exceeds its ability to produce will allocate production to those goods with

**2.** This opinion addresses *infra* the extent to which the jury may consider other factors that caused Helmac's losses and would result in a reduced damages award.

the highest profit margins—e.g., where price exceeds cost by the greatest degree.

In the case at bar, however, Roth set prices that the law determines are set illegally *relative to cost.* That is, by selling below cost, the violator loses profit temporarily to gain market share. On a short term basis, the violator does not act as a rational business. Thus, it seems unreasonable to postulate that Roth (Plastics) acted as a rational business in allocating its cost structure according to prices. *See Torrington Co. v. United States,* 772 F.Supp. 1284, 1288 (CIT 1991) (analyzing the 1930 Act). Moreover, as Roth's expert points out, the actual costs of particular goods are not affected by prices at which those goods are sold. That is, regardless of how Roth may allocate production from one good to another, the cost of making those goods are unlikely to be affected.[3]

The calculation of damages shall therefore be based upon Roth's proposed allocation of labor and material costs with the exception that the factual disputes described above shall be issues for the jury. This approach remains consistent with Sixth Circuit precedent. *D.E. Rogers, supra.*

### III. *The Status of Imported Components*

#### A. Choosing a Legal Standard

■ Helmac seeks damages for finished goods made in the United States at the Lewiston plant from components that arrived from Canada. Roth claims that the Lewiston products remain outside the scope of the Act. There is no case law on the subject under the Act. Both sides discuss case law regarding the Tariff Act of 1930, as amended, 19 U.S.C. § 1303 *et seq.* (West 1980 and 1992 Supp.) ("the 1930 Act") as persuasive authority.[4]

*See e.g., NTN Bearing Corp. of America v. United States,* 802 F.Supp. 448 (C.I.T.1992).

The parties, however, dispute the test for what constitutes an anti-dumping violation of a component under the 1930 Act. Both parties agree that the key issue is whether the importation of parts constitutes the importation of finished products. Roth contends that importing parts constitutes the importation of finished products if "a significant amount of value [is] added during the United States assembly and processing operations." *J.C. Hallman Mfg. Co., Ltd. v. U.S.,* 728 F.Supp. 751 (C.I.T. 1989). Helmac contends that *J.C. Hallman* takes a minority view that is insupportable. Helmac states that imported parts should be treated as imported goods if the defendant is attempting to circumvent the trade laws. Helmac cites *Mitsubishi Electric Corp. v. U.S.,* 898 F.2d 1577 (Fed. Cir.1990), *Gold Star Co. v. U.S.,* 692 F.Supp. 1382 (C.I.T.1988), *Aff'd sub nom. Samsung Electronics Co., Ltd. v. U.S.,* 873 F.2d 1427 (Fed.Cir.1989), *NTN Bearing Corp. of America v. U.S.,* 802 F.Supp. 448 (C.I.T.1992).

In *NTN,* imported parts were transferred to a related United States company which assembled them into a finished bearing. The Court found a violation, stating that "[i]f the Court were to allow separate importations of component parts to a related party for subsequent assembly into a finished product, the domestic industry would continue to suffer the injurious consequences of dumped goods." *NTN, supra.*

*NTN* adopted an "exclusive purpose" test:

[when] prefabricated components are imported for the *exclusive purpose* of finishing into a product that would be subject to

---

3. An exception would be economies of scale that are obtained from shifting production, such as a reduction in price from purchasing large amounts of a component material. Helmac's expert does not make any such claim, but limits his analysis to a statement of general economic principles.

4. The Court concurs with the parties' judgment that litigation under the 1930 Act anti-dumping provision, *see* 19 U.S.C. § 1673 (West.1992 Supp.), 79 C.F.R. 353.0, is sufficiently similar on the matter in question as to warrant the comparison. In its Response Brief Regarding the Applicability of anti-dumping law to Defendant's products, Roth argues for the first time that because of different operative language between the 1930 Act and the 1916 Act as well as the penal nature of the 1916 Act, cases decided under the 1930 Act should not govern. Significantly, Roth cited 1930 Act case law in its first brief without raising these arguments. While the Court chooses not to address them because of their untimely appearance, the Court is convinced that under the interpretation of the 1916 Act adopted in this Order, *see infra,* Roth's concerns regarding a broad interpretation of the 1916 Act are not warranted.

a dumping order, thereby escaping dumping penalties, then the components are properly within the scope of the investigation and subsequent order.

*Id.*

In *Mitsubishi*, the Federal Circuit upheld a Commerce Department determination to include subassemblies in an anti-dumping investigation "because such subassemblies are not 'traded' except to the extent they are sold after they have been used in ... production." 50 Fed.Reg. at 45,448, quoted at 898 F.2d 1583.

Therefore, Helmac has produced two arguments to defeat the Roth test: (1) without the exclusive purpose test, the law is evaded and (2) the components manufactured abroad have no market in the United States.

The latter critique indirectly undermines Roth's proposed significant added value test. That is, Roth claims the components are worth more after work is performed at Lewiston. According to Helmac, these components only have value to Roth in their intermediate stage of assembly when they cross the border. However, the value created at Lewiston adds little to the United States economy: The work at Lewiston is insignificant, both as to man-hours and time. Thus, the completed assembly in the United States constitutes nothing other than a circumvention of the anti-dumping laws.

Helmac's contention that *J.C. Hallman* does not adopt the significant value added test appears misplaced; the language of the case is plain. Moreover, it is not dictum as Helmac claims, but a determination that the United States operations were "relatively minor" *under* the test. The question remains open however whether the significant value added test is appropriate if Roth was merely attempting to circumvent the anti-dumping laws. The *Gold Star* court explicitly rejected the defense to an anti-dumping charge that adding significant value to a product in American assembly operations avoided liability. 692 F.Supp. 1382 at 1386.

The parties also dispute whether the cases distinguish between "prefabricated components" and "raw materials." The Court concurs with Helmac's position that this is a distinction without a difference.

The Court finds that the *J.C. Hallman* significant added value test should be combined with the *Mitsubishi* language as follows:

the Lewiston operations will free the Roth products from application of the law if the operations added significant value to the products *and* did not serve exclusively to avoid application of the anti-dumping laws.

This compromise is not a result of splitting the baby, but rather it combines the advantages offered by each approach. To the extent that Lewiston workers perform significant value creating work, this Court sees no reason to provide Roth (Plastics) with an excuse to terminate operations in the United States. However, insofar as the operations at Lewiston may be, in reality, a *de minimis* exercise to avoid anti-dumping laws, a foreign corporation should not be able to damage an American industry and escape accountability by the painting of an American flag on an essentially foreign product.

This modified test is also similar to that found in the corporate tax area, where courts must distinguish between legal efforts to avoid taxation through the transfer of wealth to other entities and the illegal effort to characterize wealth through the creation of sham entities.

B. Applying the Standard

Roth argues that the United States operations constituted a substantial part of the value of the products made at the Lewiston factory, and Helmac contends that the American portion was insubstantial and merely a device to avoid the United States' foreign trade laws. Both parties have performed extensive discovery, and they have radically different interpretations of the economic significance of the Lewiston operations.

The Court finds that the importation of parts could reasonably constitute an attempt to avoid the Act; however, it finds that this matter is one open to interpretation by a jury and is not resolvable as a matter for the Court, at least at this time. Therefore, the Court will not exclude evidence of the materi-

als imported for final manufacture into the Lewiston factory. The jury will decide whether the evidence supports Roth's claim that a significant amount of value was added during the United States assembly and processing operations and whether the Lewiston factory was set up exclusively to circumvent the anti-dumping laws. The Court will consider the issue of burden of proof on this matter when the parties submit proposed jury instructions.

Roth's Motion in Limine is DENIED.

### IV. *Helmac's Motion in Limine to Exclude Evidence Relating to Helmac's Motivation is HELD IN ABEYANCE.*

The Court does not believe that this evidence is likely to relevant at trial; however, it is possible that references to the past relationship of the companies or their principals might be relevant to the damages question. The Court will entertain further argument on this matter at the final pretrial conference. The Court's views are the same regarding the motion excluding Mr. Ettinger as a witness.

### V. *Conclusion*

(1) There will be a jury trial on damages.

(2) Helmac's Motion in Limine to Exclude Evidence Relating to Competitive Effects is DENIED, except as described in the opinion.

(3) Roth's Motion in Limine to Preclude Helmac from Introducing Damage Evidence Which Incorporates Losses Attributable to Roth's Lawful Conduct is DENIED since the jury must determine what pricing conduct is lawful and unlawful.

(4) Roth's Motion regarding the appropriate choice of damages methodology is GRANTED in PART and DENIED in PART as described in the opinion.

(5) Roth's Motion in Limine to Exclude Evidence Relating to the Sale of Products Manufactured or Assembled in the United States is DENIED.

(6) Helmac's Motion in Limine to Exclude Evidence Relating to Helmac's Motivation for Bringing Suit is HELD in ABEYANCE until the final pretrial conference.

(7) Helmac's Motion in Limine to Exclude David Ettinger from Roth Plastics' Witness is HELD in ABEYANCE pending further argument at final pretrial conference.

(8) Roth's Motion in Limine to Exclude Hearsay Evidence of Statements Allegedly made by Actual or Potential Helmac Customers is DISMISSED without prejudice. The Court will not rule on a hearsay objection absent particular circumstances at trial.

SO ORDERED.

## OPINION DENYING MOTIONS FOR RECONSIDERATION AND TO STAY DISCOVERY

Pending before the Court are the following motions: Helmac's Motion for Reconsideration/Clarification; Roth's Motion for Separate Trials and to Stay Discovery Relating to the Second Trial; Helmac's Motion for Substituted Service. This last motion has been withdrawn.[1]

### I. Helmac's Motion for Clarification and Reconsideration of the January 6, 1993 Order

#### A. *Issues for Clarification*

1. Prejudice (Helmac's Brief of January 25, 1993 at 6–8, 12–14 (hereinafter, "January 25 Brief"))

The Court shall not determine its response to prejudice incurred by Helmac as a result of document destruction by Roth in a wholesale manner prior to trial, with the exception of its prior ruling addressing price suppression in the January 6, 1993 Order. In those cases where Roth has destroyed documents in areas other than those concerning prices, *i.e.*, production records, *see* Helmac's Brief of January 25, 1993 at 14–16, the Court will take steps at trial in accordance with the Federal Rules of Evidence to ensure that

---

**1.** Counsel for Helmac telephoned the law clerk on February 10, 1993 to provide notice of the withdrawal.

Helmac does not suffer prejudice. These steps may include doing nothing, instructing the jury to make conclusive presumptions, preventing Roth from making particular arguments or taking other appropriate action. The Court considers these matters to be questions of evidence, however, and it is unable to determine outside the context of the trial how best to protect the interests of both parties and the fairness of the proceeding.

## 2. Jury Issues (Helmac's January 25 Brief at 11)

It is understandable that Helmac remains somewhat confused by the description of the following issues to be decided by the jury: "the calculation of selling and delivery expenses as a percentage of material costs" and "the calculation of general and administrative expenses as a percentage of material costs." The Court intends to proceed with the labor/material theory of cost allocation outlined in the January 6, 1993 opinion.

It may well be the case that selling, delivery, general, and administrative expenses should not be considered by the jury as relevant to the labor/material approach to cost allocation. If that is the case, then the Court will entertain a motion in limine to exclude that evidence, so long as the motion is premised on the labor/material cost allocation set out in the January 6, 1993 order. If the evidence is relevant under the labor/material approach, then the Court need not decide prior to instructing the jury at the close of trial exactly how it is relevant to the calculation of Roth's costs. If the evidence survives an objection to its admission, then the Court shall wait until after the evidence is admitted to determine exactly how it shall instruct the jury as to its relevance.

## B. *Issues for Reconsideration*

As far as the Court can determine, the remaining issues raised by Helmac are those in which it seeks reconsideration, and this Court shall review these issues in accordance with Fed.R.Civ.P. 59(e) and Local Rule 7.1(h)(3).

### 1. Default Judgment on Damages

The Court rejects Helmac's request for a default judgment on damages (January 25, Brief, at 14–16) under Local Rule 7.1(h)(3).

### 2. Allocation of Costs and Prejudice

#### a. *Factual or Legal Issue*

Helmac's contention that the method of allocating cost (January 25 Brief at 21–25; Reply Brief at 2) is a factual issue is Denied under Local Rule 7.1(h)(3). *See* January 6, 1993 Order at 585–86. The Court shall elaborate on its reasons, however, about why it treats the matter as a question of law. The Court, quite plainly, has left the jury to decide a number of factual issues. The jury does not have the power to interpret the meaning of the Anti–Dumping Act of 1916, 15 U.S.C. § 72 ("the 1916 Act") however, and what reasonably may constitute damages under this Act. No case cited by Helmac in its briefs alters this traditional understanding of the Court's powers. Helmac fails to explain how the Court's adoption of the test does *not* implicate the interpretation of the legal standard for damages under the 1916 Act.

#### b. *Method of Cost Allocation*

Helmac seeks a reconsideration of the Court's choice of how it allocates costs (Helmac's Brief of January 25 at 9–10, 25–29; Helmac's entire supplemental brief, dated January 27, 1993; Helmac's Reply Brief of February 8, 1993 at 1). The Court considers Helmac's argument to merely restate its arguments raised prior to the issuance of the January 6, 1993 Order. Therefore the Court shall not address it, *see* Local Rule 7.1(h)(3), except to make two points.

Helmac's concerns regarding prejudice may be raised by way of specific objections at trial, *see supra* § A(2).

Helmac's contention that the Court misinterpreted its methodology in the January 6, 1993 Order at 586, *see* Helmac's January 25 Brief at 28–29, warrants a response. The Court stated in the Order that, "it seems unreasonable to postulate that Roth (Plastics) acted as a rational business in allocating its cost structure according to prices." January 6, 1993 Order at 586. The Court therefore rejected Helmac's proposed test relying

upon the estimate of Roth's cost per product by looking to Roth's sales volume.

Helmac claims that "[t]he purpose of the test is to determine what prices would be if the defendant were rational." January 25 Brief at 28, *citing D.E. Rogers Associates, Inc. v. Gardner–Denver Co.*, 718 F.2d 1431, 1436 (6th Cir.1983), *cert. denied.* The Court disagrees. It is true that the assumption of rationality makes sense in the context in which the *D.E. Rogers* court looked to cost structure: to determine if prices were set in a predatory fashion to show *intent. D.E. Rogers*, 718 F.2d at 1437, *see also*, Helmac's January 25 Brief at 17.

The Court does not look to cost to determine predatory intent. *See infra*, § B(3). Intent has already been established. *Id.* Rather, the Court is using Roth's costs as a benchmark because it is the most reasonable measure to calculate whether Roth's prices were set in a manner that would cause unfair harm to its American competitor. *Id.* Given this purpose of using cost, the Court is concerned with employing an accurate measure of Roth's real costs—not Roth's hypothetical rational costs.

As to Helmac's comment, *see* January Brief at 29, that the Court's January 6, 1993 Order incorrectly criticizes Helmac's method for failing to account for depressed revenues as a result of Roth's dumping, the Court acknowledges error, but that change on this particular point does not alter the Court's view of the cost allocation method.

### c. *Evidence of Direct Sales*

With regard to Helmac's concern about its evidence of Roth's direct costs of U.S. sales not being considered, *see* Helmac's Brief of January 25 at 11–12, the Court is forced to agree with Roth's Response Brief at 9 where it states, "The ⅙ Opinion at 8 expressly identifies three issues that are going to be submitted to the jury. Helmac simply ignores this ruling." The Court finds it obviously reasonable to submit direct evidence of the cost of sales to the jury presuming that the jury will determine what sales costs are.[2]

### 3. Average Variable Cost as Benchmark for Damages

#### a. *AVC as a measure of harmful effect*

The Court rejects Helmac's request to reconsider its adoption of average variable cost (AVC) as the benchmark price by which damages are measured. (January 25 Brief at 16–19; Reply Brief at 3–4). However, this issue warrants additional discussion. Helmac's first argument supposes that the Court adopted AVC to show "intent," and then shows that this technique is silly, since the Court has already found intent. The Court did not pick AVC to show intent, however, so the argument is rejected.

Helmac's second argument is that a cost-based test makes no sense because, if not to show intent, the cost test must have been chosen for its anti-competitive effect, and this Court ruled in the Memorandum Opinion and Order filed July 14, 1992 ("1992 Order") 814 F.Supp. at 575–76, that the Anti–Dumping Act of 1916 provides a cause of action even when there is no anti-competitive effect. Helmac's Brief of January 25 at 19.

■ This argument incorrectly assumes that under the 1916 Act, a company could recover damages under the Act merely because it has a cause of action. Under the interpretation of the 1916 Act in *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1190, 1215 (E.D.Pa.1980), *revs'd. in part on other grounds, sub nom In re Japanese Electronic Products Antitrust Litig.*, 723 F.2d 319 (3rd Cir.1983), and expressly adopted by this Court in the 1992 Order at 4–14, that outcome is not true.

■ The *Zenith Radio* court concluded that the 1916 Act is an antitrust statute and not a protectionist statute.[3] As a result, it

---

**2.** To the extent that sales costs may be determined by motion ruling to be irrelevant, *see supra*, § A.2, then, of course, the evidence will be barred.

**3.** Roth, in its response brief at 10 n. 10, contends that this Court erred in its January 7, 1993 order because it labelled the Act as "admittedly protectionist" after having adopted the *Zenith Radio* interpretation of legislative intent. This court agrees that the Act is fundamentally to be interpreted in accord with antitrust doctrine. That does not mean, however, that the Court should never look to other anti-dumping statutes, *e.g.*, Tariff Acts of 1913, 1930 for guidance in inter-

suggested "that the statute should be interpreted whenever possible to parallel the unfair competition law applicable to domestic commerce." 494 F.Supp. at 1223 (internal quotation omitted). The 1916 Act allows a lawsuit to be filed against a foreign company that has intended to harm a domestic industry. 1992 Order 814 F.Supp. at 575–76. That the lawsuit has been allowed does not mean that damages will be won however.

 This Court has been guided by the application of antitrust law in the determination of other issues, 1992 Order at 14, and it has, in an effort to interpret the 1916 Act consistently, applied antitrust principles to its damages methodology. January 6, 1993 Order at 583. Just as there are no automatic damages under § 2(a) Robinson–Patman Act violations, *J. Truett Payne Co. v. Chrysler Motor Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981), so may the 1916 Act be violated without damages being owed.

 The Court does not quarrel with Helmac's reasoning that the key to liability under the Act is dumping: the pricing of goods on the American market at a price lower than in the home market. However, the Court finds that this price differential does not provide the basis for determining what constitutes a reasonable measure of calculating the harm caused to a domestic industry by a anti-competitive behavior from a foreign producer *in accordance with antitrust principles.*

b. *The Court need not adopt INGLIS.*

 As to Helmac's footnote argument, *see* January 25 Brief at 19 n. 3, that the Court should adopt average total cost rather than average variable cost as a benchmark for the calculation of damages, this argument has been waived, and it shall not be addressed on reconsideration. Even if it had not been waived, however, the Court need

preting particular aspects of the 1916 Act, such as what constitutes an import. *See* 1992 Order 814 F.Supp. at 567; *Zenith Radio,* at 494 F.Supp. at 1216. Nor does it mean that the 1916 Act does not have some protectionist effects in spite of the intentions of its drafters. *See* 1992 Order 814 F.Supp. at 566 n. 1, 567, 567 n. 2 and supporting authority. In short, "antitrust" is not an antonym for "protectionist."

not adopt the Sixth Circuit's test for predatory pricing in a monopoly context, *see Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 729 F.2d 1050, 1056 (6th Cir.1984), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984) to interpret damages under the Anti–Dumping Act of 1916 in accord with general antitrust principles.[4] The predatory pricing test concerns *intent;* here, the Act is concerned with effect.

### 4. Definition of Import

The Court rejects Helmac's contention that the Court adopt a new definition of what constitutes an import (January 25 Brief at 29–32; Reply Brief at 4) under Local Rule 7.1(h)(3).

### II. Roth's Motion For Bifurcated Trials and to Stay Discovery

Roth has requested that a separate trial be held on the matter of Helmac's supplemental complaint. There is a serious concern with regard to judicial economy and delay in this case, which was first filed in 1984. One trial will probably save several days of court time in selecting one jury, halving the number of opening and closing arguments, and requiring key witnesses to testify only once. This concern would, of course, be outweighed by a clear showing from Roth that a fair trial is impossible without bifurcation. Fed.R.Civ.P. 42(b). *See* 5 James Wm. Moore, Jo D. Lucas, *Moore's Federal Practice* § 42.03[1] at 42–36–68 (1992).

 "It is the interest of efficient judicial administration that is to be controlling, rather than the wishes of the parties." 9 Charles Alan Wright, Arthur Miller, *Federal Practice and Procedure* § 2388 at 279 (1971 & supp. 1992). The trial court is granted considerable discretion to determine whether separation is necessary to advance fairness in

4. In *Arthur S. Langenderfer,* the Sixth Circuit adopted the standard propounded in *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). This test is commonly known as the *Inglis* test.

a particular case. *See In re Bendectin Litig.*, 857 F.2d 290, 308 (6th Cir.1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989).

 Roth may be concerned that evidence of its destruction of documents may prejudice the jury's decision-making with regard to the issue of damages for the 1916 Act violation. The Court does not believe that separate trials will make much of a difference in this regard. The Court will issue instructions to the jury not to allow its views as to the evidence destruction affect its decision with regard to damages under the 1916 Act. Juries are presumed to follow instructions from the Court.

Furthermore, even if separate trials were held, the jury would be instructed that Roth's liability has already been established including Roth's *intent* to injure Helmac through unfair competition. As in any trial on damages in which liability has previously been established, there is always some danger that the jury could falsely infer that the prior finding of liability requires damages to be awarded. The Court will make clear to the jury that its resolution of the damages under the 1916 Act must not be influenced by its findings with regard to the destruction of evidence charge.

In criminal trials, juries routinely convict on some counts and not on others, even though considerable evidence of the bad acts of the defendant might conceivably prejudice the jury to desire to punish him by returning a guilty verdict on all counts. There is no reason to believe that a jury in this particular civil case will behave any less responsibly if properly instructed. Therefore, because the interest of judicial economy, convenience and expedience would be best served by a single trial, the Court DENIES the motion for bifurcation.

Because there will be one trial only, discovery as to the second complaint must proceed expeditiously, and Roth's Motion to Stay Discovery is DENIED.

## CONCLUSION

Helmac's motion for Reconsideration/Clarification (Dkt. # 356, parts 1 & 2, filed 1/25/93) is DENIED.

Roth's motion to stay discovery (Dkt. # 358, filed 1/26/93) is DENIED, and one trial shall be held.

Helmac's motion to substitute service (Dkt. # 359, filed 1/27/93) has been WITHDRAWN.

SO ORDERED.